[No. S011486. Mar. 30, 1992.]

CARMA DEVELOPERS (CALIFORNIA), INC., Plaintiff and Appellant,
v.
MARATHON DEVELOPMENT CALIFORNIA, INC., Defendant and
Appellant.

346

**COUNSEL**

Horning, Janin & Harvey, Richard Allan Horning, D. Peter Harvey and Thomas C. Lee for Plaintiff and Appellant.

Pillsbury, Madison & Sutro, Walter R. Allan, Vaughn R. Walker and Christopher R. Ball for Defendant and Appellant.

Cox, Castle & Nicholson and W. M. Lines as Amici Curiae on behalf of Defendant and Appellant.

## OPINION

**PUGLIA, Acting C. J.**[1]—At issue here is the validity of a provision in a commercial lease allowing the lessor to terminate the lease and recapture the leasehold upon notice by the lessee of intent to sublet or assign. Such a provision was included in a 10-year lease of office space between the parties to this appeal. Several years into the lease term the lessee, plaintiff and appellant Carma Developers (California), Inc. (Carma), gave notice of intent to sublease 80 percent of the demised premises. The lessor, defendant and appellant Marathon Development California, Inc. (Marathon), responded by exercising its right of termination and recapture in order to receive the benefit of the increased rental value of the leasehold.

Carma sued Marathon, inter alia, for breach of contract and of the covenant of good faith and fair dealing. The superior court summarily adjudged that "[a] 'reasonableness' standard must be read into [the termination and recapture clause] of the Lease to prevent that provision from being void as an unreasonable restraint on alienation and to prevent a forfeiture of the Lease." That court then ruled Marathon's exercise of its termination and recapture rights under the lease for the purpose of realizing the appreciated rental value was a breach of that implied "reasonableness" term and of the implied covenant of good faith and fair dealing. Issues of proximate cause and damages were submitted to a jury, which was instructed that the court had conclusively determined Marathon breached the contract and the implied covenant of good faith and fair dealing. The jury returned a verdict awarding Carma damages.

---

[1]The justices assigned to hear and decide this case were selected pursuant to the following order of this court entered into the minutes on September 26, 1989:

"The members of the court, each having recused themselves from acting upon the petition for review in this matter, the court hereby transfers the matter to the Court of Appeal, Third Appellate District, with directions to the clerk of that court to forthwith select, by lot, from the complement of justices assigned to that District, a panel of seven justices to act in the stead of this court, and to determine the petition. If Presiding Justice Puglia is among those selected by lot, he shall act as Acting Chief Justice, otherwise the justices selected by lot shall choose an Acting Chief Justice.

"The jurisdictional date having been extended to November 6, 1989, the panel is directed to rule upon and decide the petition for review within such parameter.

"In the event the petition is granted the panel shall determine the matter on its merits.

"Kaufman (signature)

"Acting Chief Justice"

Pursuant to this order, the Clerk of the Court of Appeal, Third Appellate District, forthwith selected by lot seven justices of that court to constitute the panel. On October 31, 1989, this panel granted defendant and appellant's petition for review. Subsequently, the clerk selected by lot two more justices from the remaining members of the court to replace on the original panel of seven, one justice who retired and another who died.

On Marathon's appeal, the Court of Appeal affirmed, holding that under this court's opinion in *Kendall* v. *Ernest Pestana, Inc.* (1985) 40 Cal.3d 488 [220 Cal.Rptr. 818, 709 P.2d 837], the termination and recapture clause of the lease was "repugnant" to the free alienability of the leasehold estate, that in exercising the clause to obtain a profit, Marathon's purpose was per se unreasonable, and that the clause was therefore void as an invalid restraint on alienation. The Court of Appeal also held there was "substantial evidence" Marathon had breached the implied covenant of good faith and fair dealing.

As explained hereafter, we shall conclude the termination and recapture clause did not pose an unreasonable restraint on alienation. We shall further conclude recent legislation resolving the rights of contracting parties to restrict alienation of commercial leases (Civ. Code, § 1995.010 et seq.) is applicable to this matter and expressly authorizes the clause in question. Thus, we shall conclude Marathon was justified in terminating the lease as permitted by its terms and such termination was not a breach of the covenant of good faith and fair dealing. We shall therefore reverse and direct that judgment be entered for Marathon.

## I

Carma and Marathon are commercial real estate development companies. On November 15, 1979, Marathon leased to Carma premises consisting of the 30th floor of the building at 595 Market Street, San Francisco, California (hereafter the premises). The lease was for 10 years at a base rental of $25,072.83, or $22 per square foot per year. It contained two provisions relating to sublease or assignment by the tenant. Paragraph 15(a) provided in part: "Tenant shall not, without the prior written consent of Landlord, which consent shall not be unreasonably withheld, assign this Lease or any interest herein or sublet the Premises or any part thereof, or permit the use or occupancy of the Premises by any person other than Tenant."

Paragraph 15(b) provided: "Before entering into any assignment of this Lease or into a sublease of all or part of the Premises, Tenant shall give written notice to Landlord identifying the intended assignee or sublessee by name and address and specifying the terms of the intended assignment or sublease. For a period of thirty (30) days after such notice is given, Landlord shall have the right by written notice to Tenant to terminate this Lease as of a date specified in such notice, which date shall not be less than thirty (30) days nor more than sixty (60) days after the date such notice is given. If Landlord so terminates this Lease, Landlord may, if it elects, enter into a

new lease covering the Premises with the intended assignee or sublessee on such terms as Landlord and such person may agree or enter into a new lease covering the Premises with any other person; in such event, Tenant shall not be entitled to any portion of the profit, if any, which Landlord may realize on account of such termination and reletting. From and after the date of such termination of this Lease, Tenant shall have no further obligation to Landlord hereunder, except for matters occurring or obligations arising hereunder prior to the date of such termination."

Initially Carma did not require the entire demised premises. The parties therefore executed a contemporaneous letter agreement permitting Carma, until such time as its needs expanded, to sublease a portion of the premises without risking termination. The letter provided: "notwithstanding the provisions of paragraph 15(b) of the Lease, Marathon agrees that it will not exercise its right to terminate the Lease as to space leased to sub-tenants for terms ending not later than December 31, 1984 . . . ." It further stated: "Except as specified in this letter, Landlord's rights and Tenant's obligations under paragraphs 15a and 15b [*sic*] of the lease shall remain unchanged."

Early in the lease term, Carma expended over $400,000 in tenant improvements and subleased portions of the premises to several entities. Eventually all such subleases expired and Carma occupied the entire premises. By late 1982, however, Carma decided to relocate its headquarters to Houston, Texas, and vacated most of the premises. It then sought a subtenant and contacted Marathon to determine how it would respond if Carma were to sublease. Marathon declined to answer, insisting instead that Carma submit a written notice of intent.

In March 1983, Carma wrote to Marathon requesting permission to sublet to Grubb & Ellis Company approximately 80 percent of the premises at a rate of $33.32 per square foot per year, with an option on the remaining portion in the event Carma vacated. Marathon responded with a notice of termination and then pursued a new lease agreement with Grubb & Ellis. These negotiations were unsuccessful, however, and a new tenant was not secured until approximately one year later.

After vacating the premises, Carma initiated this action, seeking damages for breach of paragraphs 15(a) and 15(b) of the lease and of the implied covenant of good faith and fair dealing and for interference with prospective economic advantage. Carma also sought a declaration of its rights and duties under the lease. Carma moved for summary adjudication of issues. The trial court granted the motion in part, concluding: (1) Marathon breached the

requirement of paragraph 15(a) that consent to a sublease may not be unreasonably withheld; (2) a commercial reasonableness standard must be read into paragraph 15(b); (3) Marathon's termination of the lease in order to appropriate sublease profits was not commercially reasonable; and (4) Marathon's refusal of consent to the sublease, termination of the lease, and refusal to permit Carma to recover the unamortized value of its improvements breached the covenant of good faith and fair dealing.

The issues of proximate cause and damages and Carma's remaining claim for damages—intentional interference with prospective economic advantage—were tried to a jury. The jury was instructed on the trial court's summary adjudication findings and its conclusive finding of breach of the lease and of the covenant of good faith and fair dealing. The jury returned a verdict in favor of Marathon on the interference claim. On the remaining claims, the jury awarded damages of $14,468.83 for breach of contract— Carma's cost of moving from the premises. For breach of the covenant of good faith and fair dealing, the jury awarded $300,649.49—the unamortized value of tenant improvements. Thereafter the court awarded Carma attorney fees in the amount of $125,000, plus costs and expenses of $17,578.08, for a total judgment of $457,692.97.[2]

Marathon appealed, contending the court erred in imposing a reasonableness standard on paragraph 15(b) and in concluding Marathon had breached the lease and covenant of good faith and fair dealing. Carma also appealed, contesting the attorney fees and cost awards and the denial of prejudgment interest. The Court of Appeal affirmed all but the cost award, remanding to the trial court with instructions to interpret the contract on the issue of costs.

## II

Before addressing the contentions raised in this appeal, it is helpful to note what is not at issue. Despite Carma's contrary insistence, we are not tasked with interpreting ambiguous contract terms. The language of paragraphs 15(a) and 15(b) is clear and unambiguous and must govern their interpretation. (Civ. Code, § 1638.) Paragraphs 15(a) and 15(b) afford the lessor alternate courses of action upon a proposed sublease or assignment by the lessee. Paragraph 15(b) permits the lessor to terminate the lease and enter into a new lease with the proposed transferee or another, in which event the lessee receives none of the profit but is relieved of further obligation to the

---

[2]The individual components of the award actually total $457,696.40, not the amount recited in the judgment. The origin of this discrepancy is uncertain. However, because of our resolution of this dispute, this mathematical inconsistency need not be resolved.

lessor. If the lessor chooses not to terminate, paragraph 15(a) prohibits sublease or assignment without consent of the lessor, which consent may not be unreasonably withheld.

 Nor is it claimed unfair contract terms were imposed upon Carma by virtue of Marathon's superior bargaining position. Both parties were sophisticated commercial entities operating at arm's length and assisted by competent counsel.

Instead, the thrust of this dispute is over whether paragraph 15(b), as written, effects an unlawful restraint on alienation. Carma contends a reasonableness standard must be read into paragraph 15(b) in order to avoid it being unlawful and to give effect to paragraph 15(a). Carma further contends termination by Marathon in order to claim appreciated rental value was per se unreasonable as well as a breach of the covenant of good faith. Marathon does not dispute that paragraph 15(b) restrains alienation or that a covenant of good faith is implied in the lease. It does dispute, however, that the restraint is unlawful or that the termination demonstrated bad faith.

Marathon relies in part upon recent legislation adding a new chapter to the Civil Code relating to transfer of a lessee's interest in a commercial lease. (Civ. Code, ch. 6, tit. 5, pt. 4, div. 3; § 1995.010 et seq.) As we shall explain more fully below, this legislation supersedes all prior law regarding restraints on alienation of such interests (Civ. Code, § 1995.210, subd. (a)) and, by its terms, applies to all commercial leases regardless of when executed (Civ. Code, § 1995.030). Nevertheless, because this legislation did not become effective until January 1, 1990, subsequent not only to execution and termination of the subject lease but also to the decisions of the trial court and Court of Appeal, we shall analyze the issues presented under both prior law and the new legislation. Because either analysis leads to the same result, we need not be concerned with whether application of the new legislation to a lease executed prior to its effective date violates the impairment of contracts provisions of the federal and state Constitutions.[3]

### III

We consider first the law existing prior to January 1, 1990. Alienation in real property law has been defined as "the transfer of the property and possession of lands, tenements, or other things, from one person to

---

[3]United States Constitution, article I, section 10, clause 1, provides: "No state shall . . . pass any . . . law impairing the obligation of contracts . . . ." California Constitution, article I, section 9 provides: "A . . . law impairing the obligation of contracts may not be passed."

another." (Black's Law Dict. (5th ed. 1979) p. 66.) ■ Unless a lease specifically provides otherwise, a tenant's rights are generally considered freely alienable. (*Kassan* v. *Stout* (1973) 9 Cal.3d 39, 43 [106 Cal.Rptr. 783, 507 P.2d 87].) Even where a lease contains a restriction, the restriction may be declared unlawful. Civil Code section 711 provides: "Conditions restraining alienation, when repugnant to the interest created, are void." This section codifies the common law prohibition against *unreasonable* restraints. (See *Wellenkamp* v. *Bank of America* (1978) 21 Cal.3d 943, 948 [148 Cal.Rptr. 379, 582 P.2d 970]; *Coast Bank* v. *Minderhout* (1964) 61 Cal.2d 311, 316 [38 Cal.Rptr. 505, 392 P.2d 265], overruled on other grounds in *Wellenkamp* v. *Bank of America, supra*, 21 Cal.3d at p. 953; *Schmidt* v. *Superior Court* (1989) 48 Cal.3d 370, 390, fn. 17 [256 Cal.Rptr. 750, 769 P.2d 932].)

In California, the modern struggle over restraints on alienation of leasehold interests began with *Richard* v. *Degen & Brody, Inc.* (1960) 181 Cal.App.2d 289 [5 Cal.Rptr. 263]. There, the appellate court adopted the majority view that " 'where a subletting or assignment of the leased premises without the consent of the lessor is prohibited, he may withhold his assent arbitrarily and without regard to the qualifications of the proposed assignee, unless . . . the lease provides that consent shall not be arbitrarily or unreasonably withheld . . . .' " (*Id.* at p. 299, quoting from 51 C.J.S., Landlord and Tenant, § 36, p. 550.) This remained the law in California until 1983 when a series of Court of Appeal decisions questioned the continued validity of the majority view.[4] These cases culminated in *Kendall* v. *Ernest Pestana, Inc., supra*, 40 Cal.3d 488 (hereafter *Kendall*), which adopted the minority view that a lease provision requiring consent to an assignment or sublease contains an implied covenant such consent shall not be unreasonably withheld. *Kendall* held "such consent may be withheld only where the lessor has a commercially reasonable objection to the assignee or the proposed use." (*Id.* at pp. 506-507.) *Kendall* noted denial of consent in these circumstances, " 'in order that the landlord may charge a higher rent than originally contracted for,' " is not commercially reasonable. (*Id.* at p. 501.) However, in neither *Kendall* nor the Court of Appeal cases preceding it did the lease contain an express grant to the lessor of absolute discretion. (*Id.* at p. 499, fn. 14.)

---

[4]In *Cohen* v. *Ratinoff* (1983) 147 Cal.App.3d 321 [195 Cal.Rptr. 84], a different division of the same district of the Court of Appeal that decided *Richard* v. *Degen & Brody, Inc., supra*, refused to follow that decision. It adopted the minority view that a lease provision requiring the lessor's consent to a sublease or assignment contains an implied covenant such consent shall not be unreasonably withheld. *Cohen* was followed by *Schweiso* v. *Williams* (1984) 150 Cal.App.3d 883 [198 Cal.Rptr. 238]. In both *Cohen* and *Schweiso*, the reviewing courts found the source of this reasonableness standard in the implied covenant of good faith and fair dealing. In *Hamilton* v. *Dixon* (1985) 168 Cal.App.3d 1004 [214 Cal.Rptr. 639], the appellate court refused to apply this new rule to a lease executed prior to the effective dates of *Cohen* and *Schweiso*.

The present case implicates a question neither presented nor decided in *Kendall*, i.e., to what extent may the parties to a lease expressly contract to restrict alienation of the lessee's leasehold interest? As we shall explain, under certain circumstances paragraph 15(b)'s express grant of discretion to terminate upon notice of intent to sublease or assign may inhibit such transfer by the lessee. It therefore poses a restraint on alienation.

## IV

■ Rigid application of the ancient rule against restraints on alienation is to be avoided. "Surely the courts do not seek to invalidate bona fide transactions by the imported application of esoteric legalisms. Our task is not to block the business pathway but to clear it, defining it by guideposts that are reasonably to be expected." (*Wong* v. *Di Grazia* (1963) 60 Cal.2d 525, 534 [35 Cal.Rptr. 241, 386 P.2d 817] [applying the rule against perpetuities to a commercial lease].) *Wellenkamp* v. *Bank of America*, *supra*, 21 Cal.3d 943 (hereafter *Wellenkamp*), adopted a balancing test for assaying the reasonableness of a challenged restraint. "[A] direct relationship exists between the *justification* for enforcement of a particular restraint on the one hand, and the *quantum of restraint*, the actual practical effect upon alienation which would result from enforcement, on the other. Thus, the greater the quantum of restraint that results from enforcement of a given clause, the greater must be the justification for that enforcement." (*Id.* at pp. 948-949.)

Marathon argues California law recognizes two alternative tests for considering a challenged restraint, finding it lawful if: (1) not repugnant to the interest created or (2) otherwise reasonable under the *Wellenkamp* (*supra*, 21 Cal.3d 943) balancing test. According to Marathon, in considering the first test, the restrictive provision must be viewed with reference to the interest created. In other words, if the restrictive provision in question limits only the interest created, it cannot perforce be considered repugnant to that interest.

This interpretation of repugnancy would effectively eliminate the rule prohibiting unreasonable restraints on alienation and render Civil Code section 711 a nullity. No condition could ever be considered repugnant to an interest of which it is an integral part. Instead, "[t]he 'repugnancy' argument is nothing more than an inaccurate expression of the proposition that public policy is opposed to such a restraint." (Schnebly, *Restraints Upon the Alienation of Legal Interests: I* (1934-1935) 44 Yale L.J. 961, 981, fn. omitted; accord, 6 Casner, American Law of Property (1952) § 26.19, p. 439.) In other words, repugnancy is another way of saying the provision in question is unreasonable. (See *Wellenkamp*, *supra*, 21 Cal.3d at p. 948; *Coast*

*Bank* v. *Minderhout, supra,* 61 Cal.2d at p. 316; *Schmidt* v. *Superior Court, supra,* 48 Cal.3d at p. 390 fn. 17.)

In assessing reasonableness, the Courts of Appeal have applied the *Wellenkamp (supra,* 21 Cal.3d 943) balancing test in varying contexts. It has been used, for example, to invalidate a restriction on the sale of property to other than theosophists at least 50 years of age *(Taormina Theosophical Community, Inc.* v. *Silver* (1983) 140 Cal.App.3d 964, 973-974 [190 Cal.Rptr. 38]) and to uphold a liquidated damages provision in a property sale agreement requiring the purchaser to pay an extra $20,000 if the property is resold to a named individual *(Zlotoff* v. *Tucker* (1984) 154 Cal.App.3d 988, 993 [201 Cal.Rptr. 692]). *Kendall* employed the balancing test in rejecting the majority view on lease provisions requiring consent to assignment. *Kendall* found no justification for an unrestricted right to disapprove a proposed assignee in the absence of an express lease provision giving the lessor that right. Adequate protection for the lessor was otherwise provided by the lessee's continuing surety obligations coupled with a clause permitting disapproval on reasonable commercial grounds. *(Kendall, supra,* 40 Cal.3d at pp. 498-500.)

In applying the balancing test to a challenged restraint, the facts and circumstances surrounding its creation and application should be considered. "[I]t is not so much the clause itself as the [lessor's] application of it that will effect an invalid restraint on the alienation of property." *(La Sala* v. *American Sav. & Loan Assn.* (1971) 5 Cal.3d 864, 882 [97 Cal.Rptr. 849, 489 P.2d 1113].) For example, *Tucker* v. *Lassen Sav. & Loan Assn.* (1974) 12 Cal.3d 629 [116 Cal.Rptr. 633, 526 P.2d 1169] considered a challenge to a due-on-sale clause requiring payment of the entire debt when the borrower either sold or further encumbered the property securing the debt. Arguably such a due-on-sale clause might have been justified in the context of an outright sale by the borrower, since the borrower's interest in maintaining the property would have been eliminated. However, in this instance, the borrower had contracted to sell the property through an installment contract, which required payment over a period of time and left title in the seller. Because the borrower retained title to the property until paid for, and hence an interest in its maintenance, justification for the restraint was found lacking. *(Id.* at p. 638.)

In this case, the Court of Appeal concluded the balance of restraint and justification militated against enforcement of paragraph 15(b). Because Marathon retained the power to terminate the lease upon a mere request for permission to assign or sublet, the court found the quantum of restraint

"total." Moreover, it found there was no justification for granting the lessor absolute power to terminate for any or no reason. As we shall explain, the Court of Appeal erred in its application of the balancing test.

V

In balancing the restraint of paragraph 15(b) against its justification, we begin by underscoring that the interest involved here is a leasehold. Restraints on alienation, and prohibitions against such restraints, find their origin in English feudal law in connection with fee estates. (4A Thompson, Commentaries on the Modern Law of Real Property (1979 Replacement) § 2015, pp. 602-604.) This early real property law was based on the ownership of all land by the sovereign. "From the crown all titles flow." (4 Thompson, Commentaries on the Modern Law of Real Property (1979 Replacement) § 1857, pp. 417-418.) Land was granted by the Crown to various lords in exchange for services, primarily military, and the Crown retained a reversionary interest upon death of the grantee. (*Ibid.*) Successive interests were created, each in exchange for services to the grantor. Restraints on alienation of these interests were presumably imposed to prevent withholding of services through transfer of the estate and to avoid frustration of reversionary rights. (4A Thompson, *op. cit. supra*, § 2015, at pp. 602-603.)

By the end of the 13th Century, with passage of the Statute Quia Emptores Terrorium, 18 Edward I, chapter 1, all reversionary rights except those of the Crown were eliminated and the modern day fee simple estate emerged. (2 Powell on Real Property (1991 rev.) Estates in Fee Simple, [¶] 177; 4 Thompson, *op. cit. supra*, § 1857, at pp. 423-425; Digby, History of Real Property (5th ed. 1897) pp. 234-239.) This in turn became part of American common law. (*Van Rensselaer* v. *Hays* (1859) 19 N.Y. 68, 75 Am.Dec. 278, 280-282; 4 Thompson, *op. cit. supra*, § 1857, at p. 425.) The primary feature of this emerging fee estate was the power of alienation. (4A Thompson, *op. cit. supra*, § 2016, at p. 615.) Consequently, any attempt to restrain alienation in the transfer of a fee estate tended to defeat the very purpose of the interest created. ▆ "It is difficult to conceive of a condition more clearly repugnant to the interest created by a grant of an estate in fee simple than the condition that the grantee shall not alien the same without the consent of the grantor." (*Murray* v. *Green* (1883) 64 Cal. 363, 367 [28 P. 118].)

Where the interest created is a leasehold, a restriction on alienation is less likely to be considered repugnant. Since very early times, the common law recognized the validity of restrictions on leasehold interests. (Gray, Restraints on the Alienation of Property (2d ed. 1895) § 101, p. 89.) A lease, by

its very nature, is limited in duration and scope and is therefore already less alienable than a fee estate. (Simes & Smith, The Law of Future Interests (2d ed. 1956) Restraints on Alienation, § 1115, pp. 7-8.) Consequently, any restriction on alienation of a tenant's leasehold interest is less detrimental to the overall free flow of property than a comparable restriction on a fee estate. (*Ibid.*) In addition, restrictions on alienation of a tenant's leasehold interest, especially a commercial interest, do not implicate either an owner's right to transfer property to those the owner chooses, such as heirs, or concern over present owners tying up property indefinitely.

The Restatement recognizes three categories of restraints on alienation: (1) those making an attempted alienation void (disabling restraints), (2) those imposing contractual liability (promissory restraints), and (3) those making all or part of the property interest subject to termination (forfeiture restraints). (Rest., Property, Perpetuities and Other Social Restrictions. (1944) § 404, pp. 2381-2390; see generally Rest.2d Property, Donative Transfers (1983) §§ 3.1, 3.2, 3.3, pp. 145-152.)

■■■ Paragraph 15(b) contains a variation of the forfeiture restraint. "A forfeiture restraint, as that phrase is used in [the] Restatement, exists only with respect to property interests which, if transferred, are supposed to terminate or to be subject to termination in whole or in part." (Rest.2d Property, Donative Transfers, *supra*, § 3.2, com. b.) Paragraph 15(b) goes beyond a simple forfeiture restraint by subjecting to termination not only the property interest sought to be transferred but the entire leasehold.

Forfeiture restraints are generally viewed more favorably than comparable disabling restraints and have gained widespread acceptance. (Rest., Property, Perpetuities and Other Social Restrictions, *supra*, § 404, com. c, p. 2383; Rest.2d Property, Perpetuities and Other Social Restrictions (1977) § 15.2, pp. 108-109, fn. 4; 5B Powell on Real Property (1991 rev.) Restraints on Alienation, [¶] 844; 4 Witkin, Summary of Cal. Law (9th ed. 1987) Real Property, § 409, p. 596; Coskran, *Assignment and Sublease Restrictions: The Tribulations of Leasehold Transfers* (1989) 22 Loyola L.A. L.Rev. 405, 453.) The reason is obvious. A disabling restraint binds the lessee to the lease throughout its term. By contrast, a forfeiture restraint permits the lessee to extricate itself if a suitable transferee can be found. The lessor must either approve a proposed transfer, releasing the lessee from all but surety obligations, or terminate the lease, releasing the lessee altogether. And since the lessor already retains a reversionary interest in the property, a forfeiture restraint merely accelerates the inevitable.

Because even the minority view adopted by the Restatement recognizes the validity of a freely negotiated disabling restraint in a lease (see Rest.2d

Property, Perpetuities and Other Social Restrictions, *supra*, § 15.2(2), p. 100); *Kendall, supra*, 40 Cal.3d at p. 499, fn. 14), it is logical to assume a freely negotiated forfeiture restraint should also be upheld. However, as previously indicated, a challenged restraint is not to be examined in a vacuum. We must consider the circumstances under which it is applied.

## VI

According to the undisputed facts, Marathon terminated the lease at a time when Carma had already curtailed operations in the area and proposed to sublease 80 percent of the premises. This sublease would have allowed Carma to reduce overhead costs commensurate with its reduced operations while at the same time realizing a profit in the form of higher rent charged the sublessee. Marathon terminated the lease in order to appropriate this profit to itself.

The practical effect of paragraph 15(b) in this context is twofold: (1) allocation of increased rental value to the lessor and (2) subjection of the entire leasehold to termination upon a proposed sublease. As to the first effect, *Kendall* specifically affirmed the power of parties to commercial lease transactions to make their own arrangements for the allocation of appreciated rent upon transfer of a leasehold interest. (*Kendall, supra*, 40 Cal.3d at p. 505, fn. 17.) Our concern is not with the fair allocation of increased rental value but the effect of the agreed allocation on the power of alienation.

As a practical matter, reserving appreciated rental value to the lessor has no effect on alienation of the lessee's interest. A commercial lessee desiring to sublease or assign *solely* to realize appreciated rental value of the premises, and not to curtail or relocate operations, would face the prospect of leasing alternate space for its operations after the transfer. This space would presumably be priced at the increased market rate as well, thereby nullifying any profit realized from the transfer.[5]

Only when this denial of profit is coupled with a desire to relocate or curtail operations does a restraint arise. For example, a lessee wishing to

---

[5]Another way to view this is to recognize that a lessee that occupies space valued at greater than the rent paid is already realizing a profit in the form of space utilization. For example, a lessee making productive use of office space rented five years ago at $10 per square foot might find that the space is now worth $20. The lessee is already profiting from occupancy of $20 office space for only $10. The restriction involved here merely prohibits converting that profit from one form, space, to another, cash. However, conversion becomes meaningless if, as a consequence, the lessee must secure alternate space at the current market rate, thereby turning its cash profit back into space.

An exception exists in the case of a marginal or unprofitable business. If the lessee is able to realize a profit from its use of the space only because the rent paid is below market, the lessee would benefit from assigning the lease and discontinuing operations. Its inability to

relocate all of its operations may find the inability to realize increased rental value through an assignment outweighs the advantages of such a move, since current market rates would have to be paid at the new location. Alienation is restrained to the extent the advantages of the move do not exceed the increased cost of space at the new location.

If the lessee wishes to discontinue or relocate only a portion of its operations, a further restraint is introduced—the risk that all rights in the premises will be lost. Alienation is restrained to the extent the lessee is unwilling to risk losing all rights in the premises, including the value of tenant improvements, in order to be free of further obligation for the unwanted space. The magnitude of this restraint will depend upon the amount of space the lessee wishes to retain, the remaining value of tenant improvements in that space, and the extent of increase in market value.

Based on the foregoing, we cannot agree with the Court of Appeal's characterization of the quantum of restraint imposed by paragraph 15(b) as "total." First, the underlying instrument is a lease. Therefore, by definition, the restraint is limited both by the duration and scope of the leasehold interest created. Second, the restraint is in the nature of a forfeiture. It therefore poses no obstacle to release of the lessee from an unfavorable lease. Third, because the lessor is only likely to exercise its right of termination when it can benefit thereby, the restraint only affects alienation in a rising market. Even then, alienation is impeded only when the lessee desires to relocate or curtail operations and the benefits of doing so are outweighed by the risk of lost profits and lost use of whatever portion of the premises the lessee desires to retain. In all other instances, the inability of the lessee to profit from a transfer should not affect its decision to do so.

## VII

We also disagree with the Court of Appeal's conclusion that justification for paragraph 15(b) is completely lacking. As with quantum of restraint, we are not concerned with justification in a vacuum. The trial court found Marathon invoked paragraph 15(b) in order to appropriate to itself the increased rental value of the property. This finding is supported by the record and is not challenged on appeal.

Carma argues, and the Court of Appeal agreed, termination for the purpose of appropriating increased rental value is per se unreasonable. However, the cases relied upon by Carma, including *Kendall, supra,* 40 Cal.3d

---

convert profitable use of space into cash thus poses a restraint. However, we are not presented with that situation here.

488, all involved a clause prohibiting assignment or sublease without the consent of the lessor. The acknowledged purpose of such a consent restraint is to avoid an unwanted tenant. The desire to obtain appreciated rental value is unrelated to this purpose. Consequently, where a lease contains a consent restraint, the parties can have no reasonable expectations with respect to allocation of appreciated rental value.

But where the lease manifests other goals and expectations, this reasoning collapses. *Kendall* recognized that what is objectionable is not a party's attempt to obtain financial benefit but an attempt "to get more than it bargained for in the lease." (*Kendall, supra,* 40 Cal.3d at p. 504, italics omitted.) Presumably both parties enter into a lease with the hope and expectation it will be profitable. Only when one party attempts to obtain more from the bargain than it reasonably could expect, at the expense of the other, does a problem arise.

Here it is Carma, not Marathon, that is trying to get more than it bargained for. Termination of the lease for the purpose of claiming increased rental value is precisely what is contemplated in paragraph 15(b). That paragraph does not merely permit termination; it allows the lessor to contract directly with the proposed sublessee or assignee and to retain for itself all profits realized from such new arrangement. Marathon's conduct was entirely consistent with the express terms of paragraph 15(b) and therefore consistent with the bargain it made with Carma. By contrast, Carma's insistence on sharing sublease profits is an attempt to obtain more than it bargained for—i.e., to recapture potential benefits previously bargained away.[6]

Admittedly, allocation of increased rental value could have been accomplished merely by providing for direct assignment of increased rent upon transfer. However, the present arrangement may be more favorable to the lessee by providing that, if the lessor chooses to claim appreciated rental value, it must first free the lessee from further obligation under the lease. At the same time the lessor is benefited by having an option: forego increased rent while keeping the lessee liable as a surety, or hope to realize the increased rent by liberating the lessee and attempting to sign a new tenant.

It is not difficult to understand why parties might agree to such an arrangement. In a rising market, a potential lessee might wish to secure a long-term lease and avoid higher rent over the coming years. By contrast,

---

[6]This is also true of Carma's attempt to recover the remaining value of tenant improvements. Paragraph 8 of the lease provided that all tenant improvements "shall immediately become Landlord's property."

because of escalating costs, a lessor may be unwilling to make a long-term commitment. To induce the lessor, the lessee may have to offer rent in excess of current market rates. Instead, the lessor may be willing to forego all or part of such increased rent in exchange for a termination and recapture clause similar to that at issue here. Such clause holds out the possibility that the premises can be reclaimed before expiration of the lease term. At the same time, the power to trigger this discretionary right remains exclusively with the lessee.

■ At the heart of any challenge to a restraint on alienation lies the tension between the competing public policies of freedom of alienation and freedom of contract. " '[I]f there is one thing which more than another public policy requires, it is that men of full age and competent understanding shall have the utmost liberty of contract, and that their contracts when entered into freely and voluntarily shall be held sacred, and shall be enforced by courts of justice.' " (*In re Garcelon* (1894) 104 Cal. 570, 591 [38 P. 414], quoting from the opinion of Sir G. Jessell, M.R., in *Printing Numerical Registering Co.* v. *Sampson*, L.R.19 Eq. 465; accord, *Northwestern M. F. Assn.* v. *Pacific Co.* (1921) 187 Cal. 38, 44 [200 P. 934]; *Vernon* v. *Drexel Burnham & Co.* (1975) 52 Cal.App.3d 706, 716 [125 Cal.Rptr. 147]; *Rosenberg* v. *Raskin* (1947) 80 Cal.App.2d 335, 338 [181 P.2d 897].) This public policy is evidenced in the recent additions to the Civil Code mentioned earlier. Civil Code section 1995.270, subdivision (a)(1) provides: "It is the public policy of the state and fundamental to the commerce and economic development of the state to enable and facilitate freedom of contract by the parties to commercial real property leases." Accordingly, subdivision (b) of section 1995.270 of the Civil Code limits retroactivity of *Kendall, supra,* 40 Cal.3d 488, in order to avoid frustrating expectations of the parties to leases executed earlier.

■ Under the facts and circumstances presented here, we find the strong public policy favoring freedom of contract in connection with a commercial lease outweighs any marginal restraint on alienation caused when the benefits of relocating or curtailing operations do not outweigh the risk that, in a rising market, the lessee will be unable to benefit financially from the transfer and will lose all rights in the premises. We therefore find paragraph 15(b), as written and applied, a *reasonable* restraint on alienation.

## VIII

■ Carma contends paragraph 15(b) cannot be viewed in isolation because paragraphs 15(a) and 15(b) are interdependent. According to Carma, termination upon a proposed transfer is tantamount to denial of consent for

such transfer. Therefore, in order to give effect to paragraph 15(a)'s requirement that consent not be unreasonably withheld, termination can be permitted only when consent to transfer could reasonably be withheld.

This contention sinks under the weight of its initial assumption. Termination of a lease and refusal to consent to a transfer differ both in purpose and effect. A sublease or assignment leaves the lessee liable as a surety for performance of the original lease while the sublessee/assignee takes over primary responsibility. Termination, on the other hand, releases the lessee from all further obligations and permits the lessor to pursue a completely new lease.

As previously indicated, the obvious purpose of paragraph 15(b) was to afford the lessor upon a proposed transfer the option to terminate the lease or proceed under paragraph 15(a). Paragraph 15(a), by contrast, was designed to guarantee that, if a suitable transferee can be found, the lessee will be able to extricate itself from primary responsibility under the lease. This is accomplished by requiring the lessor either to terminate the lease or to approve the transfer.

The construction of these two paragraphs suggested by Carma would virtually eviscerate paragraph 15(b). Under this construction, termination would be permitted only if it would also be reasonable to deny consent to the transfer. In all other instances, approval pursuant to paragraph 15(a) would be mandated. Yet, in a situation where it is reasonable to deny consent to the transfer, the lessor would have no incentive to terminate the lease and pursue a new one with the proposed transferee, as expressly permitted by paragraph 15(b). Thus, only an interpretation consistent with the express language of paragraph 15(b) would give effect to both provisions.[7]

■ Carma further contends paragraph 15(b) must be subordinated to a reasonableness standard in order to give effect to the parties' intentions as

[7]Carma contends under its interpretation paragraph 15(b) would have continued vitality where a proposed transferee is acceptable but the lessor reasonably concludes "subleasing would jeopardize its legitimate interests as lessor." Without defining what these legitimate interests would be, Carma presents the example of a lessee filing for bankruptcy protection while the sublessee continues to occupy the premises and pay rent to the bankruptcy estate. However, this example ignores 11 United States Code section 365, which requires the trustee in bankruptcy either to assume or reject the lease.

If the least is assumed, the estate is required to continue rental payments to the lessor and cure any default. (11 U.S.C. § 365(b)(1).) If rejected, the lessor is free to contract directly with the sublessee with a minimum of lost rent in the interim. (See, 1 Collier Bankruptcy Manual (3d ed. 1992 rev.) §§ 365.01-365.02.) It stretches credulity to believe paragraph 15(b) was inserted in the lease simply to avoid the inconvenience inherent in such bankruptcy administration.

manifested by their inclusion of Civil Code section 1951.4 remedies in the lease. That section permits the parties contractually to shift to the lessee the duty of mitigation in the event of a breach by the lessee.[8] Where the lease permits assignment or sublease only with consent of the lessor, this shifting is permitted only if the lease provides, expressly or impliedly, that such consent not be unreasonably withheld. (Civ. Code, § 1951.4, subd. (b)(3).) Paragraph 15(a) expressly so provides and thus satisfies this requirement. However, according to Carma, the right to shift the burden of mitigation seemingly secured by the express language of paragraph 15(a) is wholly illusory and the intent of the parties frustrated if Marathon may invoke paragraph 15(b) to terminate the lease unreasonably upon a proposed sublease or assignment.

---

[8]Civil Code section 1951.4 currently provides: "(a) The remedy described in this section is available only if the lease provides for this remedy. In addition to any other type of provision used in a lease to provide for the remedy described in this section, a provision in the lease in substantially the following form satisfies this subdivision:

" 'The lessor has the remedy described in California Civil Code Section 1951.4 (lessor may continue lease in effect after lessee's breach and abandonment and recover rent as it becomes due, if lessee has right to sublet or assign, subject only to reasonable limitations).'

"(b) Even though a lessee of real property has breached the lease and abandoned the property, the lease continues in effect for so long as the lessor does not terminate the lessee's right to possession, and the lessor may enforce all the lessor's rights and remedies under the lease, including the right to recover the rent as it becomes due under the lease, if any of the following conditions is satisfied:

"(1) The lease permits the lessee, or does not prohibit or otherwise restrict the right of the lessee, to sublet the property, assign the lessee's interest in the lease, or both.

"(2) The lease permits the lessee to sublet the property, assign the lessee's interest in the lease, or both, subject to express standards or conditions, provided the standards and conditions are reasonable at the time the lease is executed and the lessor does not require compliance with any standard or condition that has become unreasonable at the time the lessee seeks to sublet or assign. For purposes of this paragraph, an express standard or condition is presumed to be reasonable; this presumption is a presumption affecting the burden of proof.

"(3) The lease permits the lessee to sublet the property, assign the lessee's interest in the lease, or both, with the consent of the lessor, and the lease provides that the consent shall not be unreasonably withheld or the lease includes a standard implied by law that consent shall not be unreasonably withheld.

"(c) For the purposes of subdivision (b), the following do not constitute a termination of the lessee's right to possession:

"(1) Acts of maintenance or preservation or efforts to relet the property.

"(2) The appointment of a receiver upon initiative of the lessor to protect the lessor's interest under the lease.

"(3) Withholding consent to a subletting or assignment, or terminating a subletting or assignment, if the withholding or termination does not violate the rights of the lessee specified in subdivision (b)."

Civil Code section 1951.4 has been twice amended since the execution of this lease. (Stats. 1989, ch. 982, § 1; Stats. 1991, ch. 67, § 1.) The amended version is set out above. Neither amendment affects the analysis of Carma's contention considered in the related text.

Again, Carma confuses termination of the lease with denial of consent. Termination by the lessor does not frustrate the parties' intent to shift the mitigation burden. On the contrary, termination ends the lease completely and frees the lessee from all further obligation. (See Coskran, *Assignment and Sublease Restrictions: The Tribulations of Leasehold Transfers, supra,* 22 Loyola L.A. L.Rev. at pp. 475-476.) Civil Code section 1951.4 simply has no application to this case.

## IX

■■■ Having concluded paragraph 15(b) does not pose an unreasonable restraint on alienation as prohibited by Civil Code section 711, we next consider the effect of recent legislation bearing on this issue. On September 29, 1989, Senate Bill No. 536, 1989-1990 Regular Session, was enacted amending portions of Civil Code section 1951.4 and adding to the Civil Code a new chapter (Civ. Code, § 1995.010 et seq.) governing transfer restrictions in commercial leases. (Stats. 1989, ch. 982; further statutory references to sections of an undesignated code are to the Civil Code.) ■■■ The stimulus for this legislation appears to have been a desire to codify the holding of *Kendall, supra,* 40 Cal.3d 488, and resolve the question of its retroactivity. It was also intended to resolve the rights of the parties to a commercial lease to impose restrictions on transfer by the lessee and to shift to the lessee the burden of mitigation where the lease contains a restriction on transfer like that in *Kendall.* (See Legis. Counsel's Dig., Sen. Bill. No. 536, Stats. 1989, ch. 982.) Each party contends these statutory changes mandate judgment in its favor.

A primary feature of Senate Bill No. 536 was the addition of section 1995.260 codifying *Kendall, supra,* 40 Cal.3d 488. That section reads: "If a restriction on transfer of the tenant's interest in a lease requires the landlord's consent for transfer but provides no standard for giving or withholding consent, the restriction on transfer shall be construed to include an implied standard that the landlord's consent may not be unreasonably withheld. Whether the landlord's consent has been unreasonably withheld in a particular case is a question of fact on which the tenant has the burden of proof. The tenant may satisfy the burden of proof by showing that, in response to the tenant's written request for a statement of reasons for withholding consent, the landlord has failed, within a reasonable time, to state in writing a reasonable objection to the transfer." (Stats. 1989, ch. 982, § 2.)

Section 1995.260 applies only to leases entered into after September 23, 1983, the effective date of the Court of Appeal decision in *Cohen v. Ratinoff,*

*supra,* 147 Cal.App.3d 321, which presaged *Kendall.* (§ 1995.270, subd. (b).)[9] ▮▮ Marathon contends the limited retroactivity of *Kendall* mandated by section 1995.270, subdivision (b) renders that decision of no effect here and, by logical extension, nullifies Carma's attempt based on *Kendall* to interpolate a reasonableness standard into paragraph 15(b). Carma counters that sections 1995.260 and 1995.270 are inapplicable here because paragraph 15(a) contains an express reasonableness standard.

We agree with Carma that sections 1995.260 and 1995.270 are inapplicable. Section 1995.260 applies only to lease provisions requiring the lessor's consent to transfer where no standard for giving or withholding consent is included. Paragraph 15(a) contains an express reasonableness standard. More importantly, however, paragraph 15(b), which Marathon invoked to terminate the lease, is not a transfer consent restriction. Rather, it provides the lessor an option either to terminate or to invoke the transfer consent restriction of paragraph 15(a). As previously explained, termination is entirely different from denial of consent to transfer.

▮▮ Marathon contends other provisions of the new chapter are applicable to this controversy and do authorize a lease restriction such as that in paragraph 15(b). ▮▮ Section 1995.210, subdivision (a), provides: "Subject to the limitations in this chapter, a lease may include a restriction on transfer of the tenant's interest in the lease." This section, by authorizing *all* restrictions on transfer except where prohibited in other provisions of the chapter, effectively supersedes the restrictions imposed by section 711 as they would otherwise apply to commercial leases.

---

[9]The public policy supporting this limited retroactivity of *Kendall* is explained in section 1995.270, subdivision (a): "The Legislature finds and declares:

"(1) It is the public policy of the state and fundamental to the commerce and economic development of the state to enable and facilitate freedom of contract by the parties to commercial real property leases.

"(2) The parties to commercial real property leases must be able to negotiate and conduct their affairs in reasonable reliance on the rights and protections given them under the laws of the state.

"(3) Until the case of Kendall v. Ernest Pestana, Inc., 40 Cal.3d 488 (1985), and its predecessor, Cohen v. Ratinoff, 147 Cal.App.3d 321 (1983), the parties to commercial real property leases could reasonably rely on the law of the state to provide that if a lease restriction requires the landlord's consent for transfer of the tenant's interest in the lease but provides no standard for giving or withholding consent, the landlord's consent may be unreasonably withheld.

"(4) The Kendall and Cohen decisions reversed the law on which parties to commercial real property leases executed before September 23, 1983, the date of the Cohen decision, could reasonably rely, thereby frustrating the expectations of the parties, with the result of impairing commerce and economic development."

■ The other provisions of the chapter do not actually limit the power to impose transfer restrictions. Instead, they articulate examples of permissible restrictions and establish rules of construction. Section 1995.230 provides: "A restriction on transfer of a tenant's interest in a lease may absolutely prohibit transfer." Section 1995.240 permits a restriction that transfer be "subject to any express standard or condition, including, but not limited to, a provision that the landlord is entitled to some or all of any consideration the tenant receives from a transferee in excess of the rent under the lease." Section 1995.250 authorizes a restriction based on the lessor's consent to the transfer where such consent is "subject to any express standard or condition for giving or withholding consent, including, but not limited to, either of the following: [¶] (a) The landlord's consent may not be unreasonably withheld. [¶] (b) The landlord's consent may be withheld subject to express standards or conditions."

Where a lease contains *no* express restrictions on transfer, "a tenant's rights under the lease include unrestricted transfer of the tenant's interest in the lease." (§ 1995.210, subd. (b).) Any ambiguity in the terms of a transfer restriction "shall be construed in favor of transferability." (§ 1995.220.)

Marathon contends paragraph 15(b) is authorized by the general right to restrict transfer (§ 1995.210) and the specific right absolutely to prohibit transfer altogether (§ 1995.230). According to Marathon, if a lease may absolutely prohibit transfer, it may also contain a lesser restriction such as that in paragraph 15(b). Carma counters that because paragraph 15(b) does not expressly permit termination for any or no reason on a mere request to transfer and is otherwise ambiguous when viewed in conjunction with paragraph 15(a), it must be construed in favor of transferability. (§ 1995.220.)

Before addressing the parties' contentions, we first consider applicability of the new legislation to this controversy. With the exception of section 1995.260, the new chapter applies to all leases executed "before, on, or after January 1, 1990." (§ 1995.030.) Obviously, this includes the lease at issue here. Section 1995.210 authorizes parties to include restrictions on transfer in commercial leases. "Restriction on transfer" is defined in the chapter as "a provision in the lease that restricts the right of transfer of the tenant's interest in the lease." (§ 1995.020, subd. (c).) "Transfer" means "an assignment, sublease, or other voluntary or involuntary transfer or encumbrance of all or part of a tenant's interest in the lease." (§ 1995.020, subd. (e).)

Whether a given lease provision restricts transfer of a lessee's interest within the meaning of the new chapter depends upon the breadth of the term

"restrict." That term may be viewed narrowly to include only those provisions expressly eliminating or curtailing the legal power of transfer. At the other extreme, the term may be viewed to encompass any provision of an instrument which has the practical effect of impairing marketability. (Simes & Smith, The Law of Future Interests, *supra*, Restraints on Alienation, § 1111, at pp. 3-4.) This distinction has been characterized as one between direct and indirect restraints (restrictions). ▮▮ "A direct restraint on alienation is a provision in a deed, will, contract or other instrument which, by its express terms, or by implication of fact, purports to prohibit or penalize the exercise of the power of alienation. These provisions may assume a variety of forms. Thus, the conveyance or devise may contain a direction to the effect that the grantee or devisee shall not alienate, or a condition to the effect that if he attempts to alienate, his estate shall be subject to forfeiture, or there may be a contract binding on the grantee to refrain from alienation. . . . An indirect restraint on alienation arises when an attempt is made to accomplish some purpose other than the restraint of alienability, but with the incidental result that the instrument, if valid, would restrain practical alienability . . . . Ordinarily an indirect restraint does not restrict the power of alienation but only the fact of alienability." (*Id.* § 1112, at pp. 4-5.) An example of an indirect restraint is a use restriction. Alienation is restricted because the leasehold interest, being limited in possible uses, is less marketable than a lease permitting unlimited use. (See, Comment, *Restraints on Alienation: Placing a 13th Century Doctrine in 21st Century Perspective* (1988) 40 Baylor L.Rev. 413, 427.)

▮▮ It might reasonably be assumed the new chapter applies to all forms of direct restraint on transfer. But does it apply as well to indirect restraints? Obviously the new chapter was not intended to apply to such indirect restraints as use restrictions. Effective January 1, 1992, the Legislature added yet another chapter to the Civil Code (§ 1997.010 et seq.) relating specifically to use restrictions. (See Stats. 1991, ch. 67, § 3 [Sen. Bill No. 256 (1991-1992 Reg. Sess.)].)

For purposes of this appeal, we need not resolve this question. Although paragraph 15(b) could be characterized as an indirect restraint restricting alienation while seeking to achieve a different goal, i.e., allocation of appreciated rental value to the lessor, however it may be characterized we find it to be within the types of transfer restrictions contemplated by the Legislature in enacting the new chapter.

In an article written prior to adoption of Senate Bill No. 536, Professor Coskran identified "several types of lease clauses that restrict, directly or

indirectly, a transfer of all or part of the leasehold by the tenant[:]" (1) requiring consent of the lessor without specifying a standard for its exercise (*Kendall, supra*, 40 Cal.3d 488), (2) requiring express reasonable consent, (3) requiring consent in the sole discretion of the lessor, (4) requiring consent based on express conditions, (5) requiring consent but providing for specific exceptions, (6) prohibiting transfer altogether, (7) granting the lessor a right to recover possession, and (8) shifting profits. (Coskran, *Assignment and Sublease Restrictions: The Tribulations of Leasehold Transfers, supra*, 22 Loyola L.A. L.Rev. 417-418.) This article was referred to extensively in the Law Revision Commission Recommendations regarding Senate Bill No. 536. (See, 20 Cal. Law Revision Com. Rep. (1990) at pp. 254 fn. 2, 255 fn. 5, 257 fn. 11, 262, 266, 271, 273, 277.)

Regarding specific conditions on transfer, the Law Revision Commission recommended: "The parties should be able to agree on standards and conditions for transfer, and those standards and conditions should be enforceable. *The conditions might include, for example, that the landlord is entitled to recapture any consideration realized by the tenant as a result of a transfer.* So long as the limitation satisfies the general restrictions on freedom of contract, it should be recognized as valid." (20 Cal. Law Revision Com. Rep., *supra*, at pp. 258-259, italics added.) In the comments portion of revised section 1951.4 is the following discussion by the commission: "Under subdivision (c), *a provision in the lease that the lessor may elect either to consent to a subletting or assignment or to terminate the lessee's right to possession*, would not constitute a termination of the lessee's right to possession, so long as the lessor does not make the election to terminate the lessee's right to possession." (20 Cal. Law Revision Com. Rep., *supra*, at p. 263, italics added.) This discussion is repeated in the comments to section 1995.250. (20 Cal. Law Revision Com. Rep., *supra*, at p. 268.)[10] These comments demonstrate clearly the Legislature intended the term "restrict" to include not only the more traditional, direct restraint but also the last two categories mentioned by Professor Coskran, i.e., granting the lessor a right to

[10]Proposed subdivision (c) of section 1951.4 read: "For purposes of subdivision (b) [permitting the lessor to keep the lease in force following breach by the lessee], the following do not constitute a termination of the lessee's right to possession: [¶] (1) Acts of maintenance or preservation or efforts to relet the property. [¶] (2) The appointment of a receiver upon initiative of the lessor to protect the lessor's interest under the lease." (20 Cal. Law Revision Com. Rep., *supra*, at p. 261.) Although the commission's comments referred to in the text appear unrelated to the foregoing proposed subdivision, and in fact such comments were eliminated in the revised Report of the Law Revision Commission (*Id.* at pp. 274, 276), this is of no concern to our discussion here. What is important is not the language of the various statutory changes but the intent of the Legislature in using the term "restriction." The commission's comments indicate the Legislature had the type of restriction contained in paragraph 15(b) in mind when enacting Senate Bill No. 536.

recover possession and shifting profits. Because paragraph 15(b) is a combination of these two categories, we conclude the new legislation is applicable to this dispute.

## X

██ Turning next to the contentions of the parties, Carma insists paragraph 15(b) is ambiguous regarding the right to terminate for any or no reason upon a mere request to transfer. According to Carma, this ambiguity must be resolved in favor of transferability. (§ 1995.220.)

Carma relies on the absence of precise language in paragraph 15(b) permitting termination for any or no reason. However, as previously indicated, we do not evaluate a challenged restriction in a vacuum. It is undisputed Marathon exercised its termination option in order to realize appreciated rental value. Such action is contemplated in the new chapter (§ 1995.240) and is expressly authorized by paragraph 15(b). Paragraph 15(b) permits the lessor, following termination, to "enter into a new lease . . . with the intended assignee or sublessee," in which event the lessee "shall not be entitled to any portion of the profit" realized by the lessor. Thus, regardless of whether the language used was adequate to authorize termination for any or no reason, the termination at issue here was clearly authorized.

Section 1995.210, subdivision (a), permits a commercial lease to contain a restriction on transfer of the lessee's interest subject only to other limitations in the chapter. Other than the requirement that ambiguous provisions be interpreted in favor of transferability, the new chapter contains no limitations on the breadth of transfer restrictions. Thus, other than general contract limitations regarding unconscionable agreements and general restrictions against discrimination or other such statutory or constitutional prohibitions, none of which is applicable here, the parties' power to restrict transfer is unlimited. Paragraph 15(b) is lawful under the new legislation.

## XI

██ We now consider the second basis for the judgment in favor of Carma, breach of the implied covenant of good faith and fair dealing. ██ " 'Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.' (Rest.2d Contracts, § 205.) This duty has been recognized in the majority of American jurisdictions, the Restatement, and the Uniform Commercial Code. (Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith* (1980)

94 Harv.L.Rev. 369.)" (*Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 683-684 [254 Cal.Rptr. 211, 765 P.2d 373] (hereafter *Foley*).) It has been consistently applied in this state to commercial leases. (See, *Kendall, supra,* 40 Cal.3d 488; *Ellis* v. *Chevron, U. S. A., Inc.* (1988) 201 Cal.App.3d 132, 139 [246 Cal.Rptr. 863]; *Schweiso* v. *Williams, supra,* 150 Cal.App.3d 883, 886 and fn. 3; *Cohen* v. *Ratinoff, supra,* 147 Cal.App.3d 321, 328.)

The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith. (See, *Perdue* v. *Crocker National Bank* (1985) 38 Cal.3d 913, 923 [216 Cal.Rptr. 345, 702 P.2d 503]; *California Lettuce Growers Assn.* v. *Union Sugar Co.* (1955) 45 Cal.2d 474, 484 [289 P.2d 785, 49 A.L.R.2d 496].) However, defining what is required by this covenant has not always proven an easy task.

For example, it has been suggested the covenant has both a subjective and an objective aspect—subjective good faith and objective fair dealing. A party violates the covenant if it subjectively lacks belief in the validity of its act or if its conduct is objectively unreasonable. (Comment, *Reconstructing Breach of the Implied Covenant of Good Faith and Fair Dealing as a Tort* (1985) 73 Cal.L.Rev. 1291, 1303; Farnsworth, *Good Faith Performance and Commercial Reasonableness Under the Uniform Commercial Code* (1962-1963) 30 U. Chi. L.Rev. 666.) In the case of a discretionary power, it has been suggested the covenant requires the party holding such power to exercise it "for any purpose within the reasonable contemplation of the parties at the time of formation—to capture opportunities that were preserved upon entering the contract, interpreted objectively." (Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith* (1980) 94 Harv.L.Rev. 369, 373, fn. omitted.)[11]

It has also been suggested the covenant is not susceptible to firm definition but must be examined on a case-by-case basis. Instead of defining what is consistent with good faith and fair dealing, it is more meaningful to concentrate on what is prohibited. (Summers, *"Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code* (1968) 54 Va. L.Rev. 195, 201, 215-216.)

---

[11] In this context, breach of the covenant of good faith has been characterized as an attempt by the party holding the discretionary power to use it to recapture opportunities forgone in contracting. "Bad faith performance occurs precisely when discretion is used to recapture opportunities forgone upon contracting—when the discretion-exercising party refuses to pay the expected cost of performance." (Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith, supra,* 94 Harv.L.Rev. at p. 373, fn. omitted.)

Notwithstanding the difficulty in devising a rule of all-encompassing generality, a few principles have emerged in the decisions. To begin with, breach of a specific provision of the contract is not a necessary prerequisite. (See, generally, *Conoco, Inc.* v. *Inman Oil Co., Inc.* (8th Cir. 1985) 774 F.2d 895, 908.) Were it otherwise, the covenant would have no practical meaning, for any breach thereof would necessarily involve breach of some other term of the contract.[12] Nor is it necessary that the party's conduct be dishonest. Dishonesty presupposes subjective immorality; the covenant of good faith can be breached for objectively unreasonable conduct, regardless of the actor's motive. (Summers, *"Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code, supra*, 54 Va. L.Rev. at pp. 204-206.)

It is universally recognized the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract. (*Foley, supra*, 47 Cal.3d at p. 683; *Ellis* v. *Chevron, U. S. A., Inc., supra*, 201 Cal.App.3d at p. 139; *Gerdlund* v. *Electronic Dispensers International* (1987) 190 Cal.App.3d 263, 277 [235 Cal.Rptr. 279].) As explained in *Foley*, under traditional contract principles, the implied covenant of good faith is read into contracts "in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purpose." (*Foley, supra*, 47 Cal.3d at p. 690.) ▮▮▮▮▮ This in fact is consistent with the general distinction between breach of the covenant of good faith as recognized in the context of a contract action and that recognized as a tort.[13]

▮▮ It is of course a simple matter to determine whether given conduct is within the bounds of a contract's express terms. For this it is enough that the conduct is either expressly permitted or at least not prohibited. Difficulty arises in deciding whether such conduct, though not prohibited, is nevertheless contrary to the contract's purposes and the parties' legitimate expectations.

▮▮ As with its other contentions, Carma claims the covenant of good faith must be read to prohibit Marathon from invoking paragraph 15(b)

---

[12]This assumes of course we are dealing with breach of the covenant of good faith in the traditional contract sense and not as a tort. (See, discussion, fn. 13, *post*.) As a tort, a separate breach of the covenant of good faith would introduce the possibility of tort remedies and even punitive damages. However, no claim has been made here of a tortious breach.

[13]"The distinction between tort and contract is well grounded in common law, and divergent objectives underlie the remedies created in the two areas. Whereas contract actions are created to enforce the intentions of the parties to the agreement, tort law is primarily designed to vindicate 'social policy.' (Prosser, Law of Torts (4th ed. 1971) p. 613.) The covenant of good faith and fair dealing was developed in the contract arena and is aimed at making effective the agreement's promises." (*Foley, supra*, 47 Cal.3d at p. 683.)

unless Marathon has a reasonable objection to the proposed transferee such as would permit rejection of the transfer under paragraph 15(a). However, as previously explained, such interpretation would be contrary to the express language and natural import of paragraph 15(b). That paragraph does not merely permit termination upon notice of intent to sublease or assign. It also allows the lessor to pursue a new lease directly with the proposed transferee or another without sharing any profit with the lessee. Since, in pursuing this option, the lessor would be giving up an assumed stream of income from the current lessee, the only incentive for doing so would be the hope of receiving higher rent from a new lessee. Consequently, it was certainly within the reasonable expectations of the parties that Marathon might terminate the lease upon a proposed transfer in order to claim for itself appreciated rental value of the premises.

We are aware of no reported case in which a court has held the covenant of good faith may be read to prohibit a party from doing that which is expressly permitted by an agreement. ▉ On the contrary, as a general matter, implied terms should never be read to vary express terms. (*Tanner* v. *Title Ins. & Trust Co.* (1942) 20 Cal.2d 814, 824 [129 P.2d 383]; see, *Wal-Noon Corp.* v. *Hill* (1975) 45 Cal.App.3d 605, 613 [119 Cal.Rptr. 646].) ▉ "The general rule [regarding the covenant of good faith] is plainly subject to the exception that the parties may, by express provisions of the contract, grant the right to engage in the very acts and conduct which would otherwise have been forbidden by an implied covenant of good faith and fair dealing. . . . [¶] This is in accord with the general principle that, in interpreting a contract 'an implication . . . should not be made when the contrary is indicated in clear and express words.' 3 Corbin, Contracts, § 564, p. 298 (1960). . . . [¶] As to acts and conduct authorized by the express provisions of the contract, no covenant of good faith and fair dealing can be implied which forbids such acts and conduct. And if defendants were given the right to do what they did by the express provisions of the contract there can be no breach." (*VTR, Incorporated* v. *Goodyear Tire & Rubber Company* (S.D.N.Y. 1969) 303 F.Supp. 773, 777-778.)

Court of Appeal decisions of this state are in accord. In *Balfour, Guthrie & Co.* v. *Gourmet Farms* (1980) 108 Cal.App.3d 181 [166 Cal.Rptr. 422], a grain producer and broker contracted for the purchase of grain at a price to be set in the future. Grain would be delivered and the producer would receive 80 percent of the current market price. In the event of a later decline in the market price, the broker could submit a margin call, requiring the producer to return that portion of the advance exceeding 80 percent of the decreased market price. This process would continue until the price was set,

which the producer could do at any time or the broker could do following a missed margin call.

Grain was thereafter delivered, and the broker advanced 80 percent of the value. Later, the price declined, and the broker made several margin calls. When the third call was not answered, the broker fixed the price at the current market rate.

The producer sued, contending the broker breached the covenant of good faith by belatedly fixing the contract price in a falling market. The court concluded the broker had no duty under the agreement to set the price before it had done so. Its inaction was authorized, since the producer itself could have set the price at any time. According to the court, "[a]cts in accord with the terms of one's contract cannot without more be equated with bad faith." (*Balfour, Guthrie & Co.* v. *Gourmet Farms, supra,* 108 Cal.App.3d at p. 191.)

In *Brandt* v. *Lockheed Missiles & Space Co.* (1984) 154 Cal.App.3d 1124 [201 Cal.Rptr. 746], it was claimed an employer's refusal to make a "Special Invention Award" was a breach of the covenant of good faith. The employment contract provided that upon request, " '[T]he Invention Awards Committee . . . will consider whether or not a Special Invention Award shall be made to the inventor-employee. . . . Upon consideration of such request the Committee may, but is not obligated to, grant to the inventor-employee a Special Invention Award. . . . All decisions by the Committee . . . shall be final and conclusive.' " (*Id.* at p. 1129.)

The Court of Appeal concluded the employer's conduct consistent with this provision could not have breached the covenant of good faith. "[F]ew principles of our law are better settled, than that '[t]he language of a contract is to govern its interpretation, if the language is clear and explicit. . . .' [Citations.] [¶] Here the language of the parties' contract of employment, i.e., the patent plan, could not be more clear and explicit. It says Lockheed's Invention Awards Committee '*may, but is not obligated to* grant a Special Invention Award,' and that its decision on such matters 'shall be *final and conclusive.*' Lockheed had fully respected the patent plan's language; it may not reasonably be said that in doing so it violated 'a duty of good faith and fair dealing.' " (*Brandt* v. *Lockheed Missiles & Space Co., supra,* 154 Cal.App.3d at pp. 1129-1130, italics in original.)

In *Gerdlund* v. *Electronic Dispensers International, supra,* 190 Cal.App.3d 263, the Court of Appeal considered the implied covenant of good faith in connection with termination of a sales representative agreement. The contract provided: " 'This agreement shall be effective until thirty (30) days after notice of termination given by either party. Notice of termination may

be given at any time and for any reason . . . .' " (*Id.* at p. 268.) After finding error in the admission of parol evidence inconsistent with the express termination provision, the court discussed applicability of the covenant of good faith to impose a requirement of good cause for termination. "No obligation can be implied . . . which would result in the obliteration of a right expressly given under a written contract. . . . [¶] Since the breach claimed . . . related only to the termination provision, it was error to instruct the jury to apply a good faith covenant at variance with this provision." (*Id.* at pp. 277-278.)

 In this case, the Court of Appeal concluded termination of the lease solely to realize a profit was, as a matter of law, a breach of the covenant of good faith. According to the court, Marathon's response of outright termination to Carma's request for permission was capricious and arbitrary. We cannot agree. Marathon's termination of the lease in order to claim for itself appreciated rental value of the premises was expressly permitted by the lease and was clearly within the parties' reasonable expectations. In our view, such conduct can never violate an implied covenant of good faith and fair dealing.[14]

## XII

Because we conclude paragraph 15(b) is not an unreasonable restraint on alienation under the law existing prior to January 1, 1990, or a prohibited restriction on transfer under the new Civil Code chapter, and Marathon's termination of the lease for financial gain was not a breach of the covenant of good faith, we need not consider the other issues raised in this appeal.

The judgment of the Court of Appeal is reversed and that court is directed to remand to the trial court with instructions to enter judgment in favor of defendant and appellant Marathon.

Blease, J., Sparks, J., Sims, J., Marler, J., Scotland, J., and Nicholson, J., concurred.

---

[14]The trial court found Marathon's refusal to permit recovery of Carma's unamortized improvement costs a further breach of the covenant of good faith. However, because paragraph 8 of the lease specifically provided all improvements "shall immediately become Landlord's property" and either remain on the premises without compensation to the tenant or be removed at the tenant's expense, any interpretation of the covenant of good faith requiring Marathon to pay for those improvements would again be contrary to the express terms of the lease.