[No. G045795. Fourth Dist., Div. Three. Sept. 24, 2012.]

MELODY CARSON, Plaintiff and Appellant, v.
MERCURY INSURANCE COMPANY, Defendant and Respondent.

**COUNSEL**

Day Law Offices and Montie S. Day for Plaintiff and Appellant.

O'Connor, Schmeltzer & O'Connor, Lee P. O'Connor and Timothy J. O'Connor for Defendant and Respondent.

**OPINION**

**O'LEARY, P. J.**—Soon after purchasing her first new car, Melody Carson was involved in an automobile accident with a third party, who was at fault and who was insured. At the time of the accident, Carson's vehicle had a market value of $25,000. Her automobile insurance policy with Mercury Insurance Company provided it had the option of repairing or paying for Carson's vehicle, subject to several express liability limitations and exclusions. Rather than declaring the car a total loss and paying Carson $25,000 to

replace the vehicle, Mercury elected to repair the car as the initial restoration estimates were approximately $8,000. During the repair process, additional damages were revealed and Mercury paid a total of $18,774 to repair the vehicle.

Unhappy with Mercury's decision to repair the car, and unsatisfied with the work performed at the repair shop, Carson sued Mercury for breach of contract and breach of the implied covenant of good faith and fair dealing. She asserted Mercury should have taken into consideration her financial interests, specifically that her repaired vehicle would have a diminished "stigma value" (the repaired Honda was only worth approximately $8,000). In addition, she asserted her new vehicle was constructed in a way that could never be repaired to its safe preaccident condition and value. Carson alleged Mercury was obligated to declare the car a total loss and it wrongfully asserted subrogation rights against the at-fault driver. She did not prevail at the court trial.

On appeal, Carson alleges the trial court wrongly eliminated most of her claims in its pretrial rulings and it failed to consider her argument the insurance policy was unenforceable as being against public policy. She also claims the court's conclusions based on the evidence presented at trial were "impossible," which we deem to be a challenge to the sufficiency of the evidence. While we are sympathetic to her situation, we conclude all her contentions on appeal lack merit, and we affirm the judgment.

I

Sixty-five-year-old Carson purchased her first new car, a 2008 Honda Accord, on September 28, 2007, for a total cost of $31,344.60. She purchased an automobile insurance policy that provided collision coverage from Mercury.

Under the terms of the collision coverage portion of the policy, Mercury has the option of repairing, replacing, or paying for the 2008 Honda Accord if it was damaged in a collision. Specifically, the policy provided in "Part III," titled physical damage: "Coverage E—Collision: The company, at its option, will repair, replace or pay for the owned automobile or part thereof, for loss caused by collision but only for the amount of each loss in excess of the deductible stated in the declarations." In "Part III" the policy listed 23 exclusions to coverage, including as relevant to this appeal, the policy did not apply "to loss due to diminution in value of any motor vehicle repaired under coverages D or E."

In addition, "Condition No. 3" of the policy set forth the "Limit of Liability; Settlement Options; Coverages D and E" and specified the policy

would not cover depreciation: "The company's liability shall not exceed the lesser cost of the following options (1) repair or replace the motor vehicle or any part thereof, using original or non-original equipment manufactured parts, with deduction for depreciation[,] or (2) pay the agreed or appraised value of the motor vehicle."

In July 2008, Carson was involved in an automobile accident while driving in Victorville, California. Her car was struck by a Ford pickup truck driven by Guy L. Anderson, who was insured with Permanent General Assurance Corporation (Permanent General). His policy provided personal injury limits in the amount of $15,000 per person and $30,000 per accident. The property damage limits were $10,000.

Carson required medical attention and her car was taken to and inspected at Performance Paint & Body, a Mercury-approved repair facility in Victorville. The shop prepared a repair estimate in the amount of $7,918.48, and determined the actual cash preaccident value of the vehicle was $25,000. Alex Mingo, an automobile damage appraiser employed by Mercury, inspected the vehicle and prepared a repair estimate in the amount of $7,918.48.

Carson made arrangements to have her vehicle taken to a repair facility of her choice, Specialty Body Works. Jimmy Patopoff at Specialty Body Works prepared his own estimate to repair the vehicle, and determined it would cost $8,603.35 to repair.

During the repair process, Specialty Body Works found damage that was not visible when the original estimates were made. Patopoff prepared a supplemental estimate stating the repairs would cost $10,731.02. In the end, it cost a total of $18,773.62 to repair the vehicle, which included towing charges of $934.33. Mercury paid for the repairs, including Carson's $250 deductible.

Carson made a personal injury claim against Anderson's insurance. Permanent General paid her the policy limit of $15,000. Mercury pursued a subrogation claim against Permanent General for the amount it paid to repair Carson's vehicle. Permanent General paid Mercury the property damage limit ($10,000) and from this amount Carson was paid $509.91 to reimburse her for towing expenses. Carson signed Permanent General's release form.

On July 14, 2010, Carson filed a complaint against Mercury alleging causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing. She alleged the damage to her vehicle "was so substantial and major that the vehicle was unrepairable to its preaccident

condition with respect to safety, reliability, mechanics and performance, and was in a condition which, for economical and practical reasons, reasonably required the vehicle to be 'totaled.' The vehicle was by any logical financial consideration a 'total loss,' meaning that the costs of repair, plus the post-accident and pre-repair salvage value of the vehicle, and the loss of value of the vehicle, even if repaired, would be greater than the total value of the vehicle after the vehicle was repaired."

In the complaint, Carson maintained Mercury breached the terms of the policy and acted in bad faith by withholding benefits, including its failure to treat the vehicle as a total loss and paying the replacement value, failure to repair the vehicle to its preaccident condition, and asserting subrogation rights against the at-fault driver to her detriment.

## A. *Pretrial Motions*

Mercury filed a motion for summary judgment, or alternatively, summary adjudication of the second cause of action for breach of the implied covenant of good faith and fair dealing. Mercury argued it was not required to declare Carson's vehicle a total loss because the policy expressly provided it with the option of repairing or replacing the vehicle. Mercury also asserted it could not be held liable for failing to repair the vehicle to its preaccident condition because Carson selected the repair facility. Finally, Mercury alleged it properly asserted subrogation rights against Permanent General, the insurer of the driver that hit Carson's vehicle.

In its tentative ruling, the trial court (Judge Kazuharu Makino) explained there was a triable issue of fact as to whether Mercury breached its duty to repair the vehicle to its preaccident safe, mechanical, and cosmetic condition, as required under *Ray v. Farmers Ins. Exchange* (1988) 200 Cal.App.3d 1411, 1418 [246 Cal.Rptr. 593] (*Ray*). However, the court rejected Carson's assertion Mercury was required to take into account diminution in postrepair value in determining if the car was a total loss, stating, "there is a total loss only where costs of repair exceed the pre-repair value of the vehicle." (Citing *Martinez v. Enterprise Rent-A-Car Co.* (2004) 119 Cal.App.4th 46, 54–56 [13 Cal.Rptr.3d 857].) The court denied the motion. However, in the minute order the court included a statement defining "total loss."

The case was assigned to Judge Kirk H. Nakamura for trial. On the first day of trial, the trial court observed that based on the prior court's ruling on the summary judgment motion, the claims for trial were limited to whether Mercury repaired the vehicle to its preaccident safe, mechanical, and cosmetic condition. Carson argued there were two additional issues: First, Carson maintained it must be determined whether Mercury breached the

implied covenant of good faith and fair dealing because it was obligated to declare the vehicle a total loss. The court disagreed, citing to the prior minute order defining total loss and to the policy's language giving Mercury the option to repair, replace, or pay for the automobile. Second, Carson asserted there was an issue about whether Mercury improperly asserted subrogation rights. Carson explained that because her vehicle suffered diminution in value, Mercury violated the "made whole" rule by pursuing subrogation. The court stated this claim was barred because it was undisputed Carson signed a release of her property damage claim in favor of Anderson, and therefore she could not make a claim for diminution in value against him before Mercury was entitled to subrogation. The court ruled the above two issues (the good faith and fair dealing claim and the subrogation claim) could not be raised at trial.

The court then ruled on the following pretrial motions: Carson filed a motion seeking a jury instruction that Mercury breached the implied covenant of good faith and fair dealing on the grounds Mercury did not specifically deny the allegations of bad faith set forth in paragraphs 19, 20, 21, 22 and 23 of her complaint. Mercury responded that the failure to deny these allegations was an inadvertent mistake and it sought leave to file a motion for leave to file a verified first amended answer to generally and specifically deny the allegations. The court denied Carson's motion and granted Mercury's motion seeking leave to file a first amended answer.

Carson also moved for an order precluding Mercury from offering any evidence that if Carson had her car repaired at a facility associated and selected by Mercury the repairs would not have been any better than those performed by Specialty Body Works. The motion was made on the grounds such evidence was irrelevant because the vehicle "could never have been repaired to its 'preaccident' condition." At the hearing, Carson explained Mercury was obligated to repair her vehicle to the "manufacturing standards" of a brand new car. Carson also asserted she had a modern unibody car and "the repairs can never replicate" the manufacturer's standards because the car cannot be tested for crush worthiness. Mercury replied the appropriate standard for determining vehicle repair is a comparison to industry repair standards. It also maintained that if Carson had left her vehicle at Performance Paint & Body in Victorville following the accident, Mercury would have guaranteed the repairs. It explained Performance Paint & Body is a "direct repair facility for Mercury." On the other hand, Carson was permitted by California law to select a different repair facility, Specialty Body Works. Mercury paid for those repairs and Specialty Body Works made repairs and warranted the repairs for the lifetime of the vehicle so long as Carson owned it. It asserted if the repairs were not properly made by the shop of Carson's choosing, Mercury is not responsible. Carson should take the car back to

Specialty Body Works and have the repairs performed pursuant to its guarantee to her. The court agreed and denied the motion.

Both parties submitted motions in limine regarding evidence of whether the vehicle should have been declared a total loss. Carson's motion requested the court exclude any evidence Mercury had the "unilateral and absolute option" to either repair or declare the vehicle a total loss (and pay Carson the car's preaccident market value). She asserted the portion of the policy giving Mercury discretion to choose repairing or replacing was unenforceable as being against public policy. The trial court denied the motion without commenting on the public policy argument. It stated Mercury could discuss at trial what its policy states, i.e., it had the option to either repair or replace the vehicle.

Mercury's motion in limine sought to exclude evidence Carson's vehicle was a total loss on the grounds the policy gave Mercury the option to repair the car and there is no reason why it should be obligated to declare the car a total loss. Mercury explained the vehicle was valued at approximately $24,500 and the cost of repair, after deducting charges for towing, was only $17,722.29 and therefore the vehicle need not be declared a total loss. Carson opposed the motion, asserting the implied covenant of good faith and fair dealing required Mercury to calculate if the vehicle was a total loss by also considering the vehicle's diminution in value after the repairs, the vehicle's salvage value, and the loss of use of the vehicle while the vehicle is being repaired. The court granted Mercury's motion in limine, excluding evidence Carson's vehicle was a total loss.

B.  *The Trial*

The trial court bifurcated the issues of whether Carson's vehicle could be repaired, and that it was actually restored to its preaccident safe, mechanical, and cosmetic condition from the issue of whether there was a bad faith breach of the obligation to repair the vehicle to its preaccident safe, mechanical, and cosmetic condition from the issue of punitive damages. The parties agreed to proceed with a court trial on this first issue.

Carson's first witness was Rocco Avellini. He testified at length about his background and training in the automobile industry as a body shop repairman and property manager at Hertz Rent-A-Car. Avellini inspected Carson's vehicle in August 2010 when it had been driven approximately 60,000 miles. He opined the damage was "in the severe range." He discussed the areas of damage to Carson's car. Mercury objected when Carson's counsel asked Avellini to give his expert opinion about whether the repairs would have changed the deployment rate of the airbags. After considering additional

testimony, the court determined Avellini's qualification as an expert on body repairs did not render him qualified to also testify about the deployment rate of the airbags. For this same reason, the court also sustained Mercury's objections to questions about whether the vehicle was repaired to its preaccident safe condition and if the repairs negatively impacted the car's safety.

Avellini testified the car could never have been restored to its preaccident factory designed condition. The court ruled this was not the applicable standard. It determined a vehicle's repaired "preaccident condition" could not be defined by how the car looked just after it was manufactured, but rather by the repair standards prepared by the vehicle's manufacturer. On cross-examination, Avellini testified the repairs had not been done properly by Specialty Body Works, but the vehicle *could have been* properly repaired within Honda's repair specifications.

Carson testified on her own behalf. She selected Specialty Body Works to repair her vehicle on her own after calling a Honda dealership. She testified the vehicle looked cosmetically fine when she picked it up. Specialty Body Works gave her a lifetime guarantee on the repairs.

Mercury called Alex Mingo, who it employed as an estimator. He testified that he wrote a repair estimate on July 22, 2008, for $8,603.35, and he did not consider her vehicle to be a total loss. He denied being told by anyone at Specialty Body Works the vehicle should be totaled. He prepared the estimate based on the "Mitchell System," which is a computer program that contains the manufacturer's guidelines for what is repairable and how much it costs. The system will also specify when a part or area of damage is "not serviceable" meaning "it should be a total loss to the car, because there is nothing you can do. You can't replace that part." Mingo testified Carson authorized the repairs, Specialty Body Works controlled the manner of the repairs, and Mercury paid $18,773.62 for the repairs and towing.

Mercury also called Patopoff as a witness. Patopoff worked as an estimator at Specialty Body Works and handled the repair of Carson's vehicle. He also evaluated the car using the Mitchell System, which he understood utilized the repair recommendations and standards from Honda. Patopoff testified he never thought the vehicle was a total loss because it could be repaired for less than its actual cash value. Patopoff recalled Carson authorized all the repairs and the shop properly repaired the vehicle within the manufacturer's standards. Patopoff testified he never advised Mercury the vehicle should be a total loss and Carson never advised Specialty Body Works that she did not want the vehicle repaired. Carson was given a lifetime guarantee on the repairs.

Mercury's next witness was Robert Barney, an expert in the field of vehicle appraisals and valuations. He testified the vehicle was repaired to Honda's specifications, which were the same standards as existed before the accident. He opined Carson's vehicle could have been repaired to its preaccident safe, mechanical, and cosmetic condition. He stated Mercury paid for the replacement of the B-pillar and package tray but this work was not performed by Specialty Body Works. He also discovered there was no upper body sway after the repairs.

Carson called Joseph Salguiero as her expert witness. Salguiero owns an auto dealership and a body shop repair facility. Due to the lack of his education and background in engineering or metallurgy, the court ruled he was not qualified to testify that the vehicle was not repaired to its preaccident safe condition.

During closing argument, Carson's counsel conceded the vehicle was cosmetically repaired to its preaccident condition. The court ruled in favor of Mercury. It determined Carson failed to prove the vehicle *could not be* repaired to its preaccident safe, mechanical, and cosmetic condition. In addition, it concluded that even if the vehicle was not repaired to its preaccident safe, mechanical, and cosmetic condition, Mercury was not liable for the failure to properly repair the vehicle because Carson selected the repair facility that guaranteed the work.

II

A.  *Bifurcated Trial Rulings and Judgment*

The trial court's pretrial rulings eliminated many of Carson's claims and, consequently, the court determined Carson could proceed to trial only on the narrow issue of whether the vehicle could be restored to its preaccident safe, mechanical, and cosmetic condition. The court reasoned if it was determined the vehicle could not be repaired and was not repaired, then the jury could consider whether there was a bad faith breach of Mercury's obligation under the policy (and also whether punitive damages were warranted). Before analyzing the merits of the various pretrial rulings, we begin by addressing Carson's challenges to the trial court's ruling in Mercury's favor at the bench trial. As we will explain anon, Carson's inability to prove her vehicle could not be repaired to its preaccident condition renders moot many of her arguments regarding the pretrial rulings.

The trial court's decision to focus the trial on whether the vehicle was repaired to its "preaccident safe, mechanical and cosmetic condition" was based on its understanding of well-established case law. "Collision coverage

is typically limited to the cost of restoring the damaged vehicle to its preaccident condition, not to exceed the actual cash value of the car at the time of loss." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2012) ¶ 6:2024, p. 6G-4 (rev. # 1, 2011).) " 'Pre-loss condition' means the 'preaccident safe, mechanical and cosmetic condition' of the covered vehicle. [Citations.]" (*Id.* at ¶ 6:2027, p. 6G-5 (rev. # 1, 2011).)

■ As stated by the trial court, the repaired preaccident condition of the car is not defined as the condition of the car when it left the factory or the showroom floor. It aptly noted the condition of any new car changes once it is driven off the lot, and no repair can ever restore a vehicle to its pristine factory condition. And if that was the standard, then no vehicle could be adequately repaired, rendering meaningless the policy provision authorizing the insurer to "repair" the vehicle using "original or non-original equipment manufactured parts." "An interpretation which gives effect to all provisions of the contract is preferred to one which renders part of the writing superfluous, useless or inexplicable." (11 Williston on Contracts (4th ed. 2012) § 32:5, p. 704.)

Carson does not offer any authority, below or on appeal, to support her contention the factory designed condition is the appropriate standard. Honda, the manufacturer of Carson's car, has published repair specifications to be used by insurance companies and repair shops. We conclude the trial court appropriately applied the manufacturing repair specifications as the standard by which to compare the repairs on Carson's vehicle to determine if it was returned to its preaccident safe, mechanical, and cosmetic condition.

■ In California, and the majority of other jurisdictions, when the insurer elects to repair the car to its preaccident condition, it is not also required to pay for any loss of value to the vehicle, which can occur after a seriously damaged vehicle is fully repaired. (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶ 6:2025, p. 6G-4 (rev. # 1, 2011).) "To hold [the insurer] liable for the automobile's diminution in value . . . would render essentially meaningless its clear right to elect to repair rather than to pay the actual cash value of the vehicle at the time of loss." (*Ray, supra,* 200 Cal.App.3d at p. 1417.)[1]

The *Ray* case is instructive. (*Ray, supra,* 200 Cal.App.3d 1411.) In that case, the insured (Ray) sued the insurer (Farmers) for breach of contract and

---

[1] We discovered a large body of case law published in the early 2000's discussing a nationwide debate about whether diminution in value should be also paid when the insurer elects to repair the vehicle. It appears that in response to this split of authority, Mercury (and other insurance companies) clarified the policy terms by adding a specific exclusion clause declining any coverage for diminution in value. There have been no published cases on the diminution in value issue since 2005.

breach of the implied covenant, alleging Farmers was obligated "to compensate Ray, after repair of his wrecked car, for the car's diminution in market value because of its status as a wrecked car." (*Id.* at p. 1413.) The Court of Appeal affirmed the trial court's rejection of Ray's contention. It explained, "the policy unambiguously gave Farmers the right to elect to repair Ray's vehicle if the cost to repair to 'like kind and quality' was less than the actual cash value of the vehicle at the time of loss." (*Id.* at p. 1416.) The appellate court rejected Ray's theory that the term "like kind and quality" was the equivalent of "actual cash value" at the time of loss. (*Id.* at p. 1417.) It relied on the court's opinion in *Owens v. Pyeatt* (1967) 248 Cal.App.2d 840 [57 Cal.Rptr. 100] (*Owens*) holding an insurer's election to repair is conclusive "provided the repair places the automobile substantially in its preaccident condition. If it does not, then the automobile is deemed a total loss and the insurer is liable for the preaccident value of the car." (*Ray, supra,* 200 Cal.App.3d at p. 1417, citing *Owens, supra,* 248 Cal.App.2d at p. 849.)

Based on this authority, the trial court narrowed the scope of the trial to whether Mercury satisfied its obligation under the contract to repair Carson's vehicle to its preaccident safe, mechanical, and cosmetic condition. At trial, Carson admitted the vehicle was repaired to its preaccident *cosmetic* condition. She presented no evidence on whether the vehicle was restored to it preaccident *mechanical* condition. Her sole focus at trial was attempting to prove the car *could never* have been repaired to it preaccident *safe* condition, and that in fact it was not restored to its preaccident *safe* condition. We have reviewed the record and agree with the trial court's assessment that Carson was unable to prove the vehicle was unrepairable to its preaccident safe condition.

Carson's difficulties in proving her case arose when the trial court determined her designated experts, Avellini and Salguiero (both having experience as body shop repairmen or estimators), were not qualified to render an expert opinion on whether the vehicle could never be repaired to is preaccident safe condition or that the repairs otherwise impacted the car's structural safety. The court ruled these witnesses had no expertise or specialized knowledge in engineering, crash testing, or metallurgy, and therefore they lacked the proper qualifications to opine the car's structure or airbags could not be restored to a preaccident safe condition.

On appeal, Carson does not challenge these evidentiary rulings. Instead, she asserts, "Even if the experts are discounted and the [t]rial [c]ourt just uses common sense, the finding that the vehicle was restored to its 'preaccident condition' as existing before the accident is still 'impossible.' The photographs reveal this vehicle was 'destroyed' and was then rebuilt and re-engineered at a body shop by shop workers. The photographs speak 'common

sense.' . . . Remember the Supreme Court . . . has accepted Bob Dylan's account as to whether an expert is needed, affirming that 'You don't need a weatherman to know which way the wind blows,' citing (Bob Dylan, Subterranean Homesick Blues, Bringing It All Back Home[,] Columbia Records 1965). *Flowers v. Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 1001 [35 Cal.Rptr.2d 685, 884 P.2d 142].)" She explains the vehicle was essentially "re-engineered by a repair shop" by being cut into pieces and welded together in places different from that which existed before the accident. She asserts you do not need an expert because it is obvious a unibody designed car, such as her Honda, could *never* be restored to its preaccident safe condition. She is wrong for two reasons.

First, our Supreme Court's reference to Bob Dylan's song was made in the context of a medical malpractice case and related to the "common knowledge" exception to expert testimony: " ' "The standard of care against which the acts of a physician are to be measured is a matter peculiarly within the knowledge of experts; it presents the basic issue in a malpractice action and can only be proved by their testimony [citations], unless the conduct required by the particular circumstances is within the common knowledge of the layman." [Citations.]' [Citations.] The 'common knowledge' exception is principally limited to situations in which the plaintiff can invoke the doctrine of res ipsa loquitur, i.e., when a layperson 'is able to say as a matter of common knowledge and observation that the consequences of professional treatment were not such as ordinarily would have followed if due care had been exercised.' [Citation.] The classic example, of course, is the X-ray revealing a scalpel left in the patient's body following surgery. [Citation.]" (*Flowers v. Torrance Memorial Hospital Medical Center, supra*, 8 Cal.4th at p. 1001, fn. omitted.)

■ We do not agree with Carson's contention that a layperson observing the photographs of her damaged vehicle could say as a matter of common knowledge the vehicle could *never* be repaired to its preaccident *safe* condition. In contrast to the medical negligence readily apparent from simply observing the abandoned scalpel, the workings of and safety levels of repaired airbags, crush zones, and metal welds are not obvious from a set of photographs of the car. It cannot be said a reasonable person has an inherent understanding of the causal relationship between particular metal welds and the restoration of crush zones, to the deployment rate of the airbags, or the overall structural safety of the car. We agree with the trial court's assessment that this type of evidence, essentially establishing a causal link between a repair and a safety feature, are matters peculiarly within the knowledge of experts, having specialized training, skill, or experience in car engineering, metallurgy, or crash testing. Moreover, because Mercury was not obligated to restore the vehicle to its factory or showroom quality condition, expert testimony would be required to prove if Honda's repair specifications were

not properly implemented. The evaluation and determination of Honda's rules for repairing its vehicles is beyond the common knowledge of a layperson.

On the other hand, Mercury presented undisputed evidence the unibody car *could have been* repaired to manufacturing repair specifications. It presented evidence it paid nearly $18,000 to have the vehicle repaired to those specifications. Mercury presented evidence Specialty Body Works could have properly repaired the vehicle. Carson's alleged expert also admitted the vehicle could be fixed following Honda's repair specifications (just not to its factory condition). And although pictures of the damaged car can suggest the car was not repairable, the court was free to determine this speculative inference was outweighed by Mercury's substantial evidence to the contrary. We find no reason to disturb the trial court's determination that Mercury's decision to repair the car to its preaccident condition was possible, and therefore it did not breach the contract or covenant of good faith and fair dealing.

Second, in her briefing Carson fails to appreciate the issue of whether her car *could* be repaired to its preaccident safe condition is different from whether the car actually *was* so repaired. As discussed above, the first issue directly relates to Mercury's liability for breach of contract and breach of the covenant of good faith and fair dealing. This is because under the terms of the policy Mercury had the discretion to repair rather than pay the market value of Carson's vehicle, and after having decided to repair it, Mercury would be liable if there was evidence the car actually could not have been repaired to its preaccident safe condition.

The second related issue of whether the car *was actually repaired* properly in this case was not relevant to Carson's claim against Mercury because it was undisputed Carson selected her own repair facility that guaranteed the work. As correctly stated in Mercury's briefing, Insurance Code section 758.5, subdivision (b)(3), provides that if an insured agrees to use an auto body shop recommended by the insurer, the insured is not liable for any further costs of repair. The insurer guarantees the repairs. The same cannot be true if the insured selects the body shop. Mercury paid the insured for the repairs, and the insured can and should return to the body shop if there is a problem with the repairs. It would be unfair to allow Carson to select a poor repair facility and then ask Mercury to pay for a redo of the same repairs. Mercury was only obligated to pay the amount necessary to restore the care to its preaccident condition and it did so. The evidence was undisputed Specialty Body Works was independent of Mercury and guaranteed it own repairs. Carson's remedy is to return her vehicle to Specialty Body Works and have the repairs done properly pursuant to its guarantee.

Therefore, as the trial court properly recognized, the issue of whether the car was actually repaired to a safe condition was not dispositive. When ruling in Mercury's favor, the court recognized there was some evidence Carson's vehicle required further repairs from Specialty Body Works. The court stated someone at the repair facility missed an issue with the airbag sensors and the shop likely should have replaced rather than welded the B-Pillar section of the vehicle. The court concluded that due to these problems there was some doubt as to whether the vehicle was currently in a safe condition, however, this conclusion was not grounds to hold Mercury liable for breaching the contract. The court explained the current state of the vehicle could not be used to prove the vehicle in question was nonrepairable. There was no evidence suggesting that if Carson returned the vehicle to Specialty Body Works the car could not be eventually restored properly to its preaccident safe, mechanical, and cosmetic condition.

## B.   *Pretrial Rulings*

Carson asserts the court erroneously pretried the majority of her case in making various rulings before trial. She asserts the court effectively denied her right to try her case. On appeal, Carson repeatedly states a long laundry list of issues she claims *would* have been litigated but for the pretrial rulings. However, her briefing is essentially limited to the following five broad categories of argument: (1) the policy was ambiguous and should be construed against Mercury to compel declaring her vehicle a total loss due to its depreciation in value; (2) Mercury and the court did not correctly define when a vehicle is a "total loss" because they failed to take into account the vehicle's depreciation in value; (3) the policy provision giving Mercury a unilateral option to repair a nonrepairable vehicle must be deemed unenforceable as against public policy; (4) the court erroneously excluded evidence regarding Mercury's wrongful demand for subrogation rights without Carson being "made whole"; and (5) the covenant of good faith and fair dealing can apply even if the underlying contract is not expressly breached, and therefore, the covenant applies (a) to Mercury's duty to properly investigate a claim, (b) to obligations set forth in Insurance Code section 790.03, (c) to Mercury's consideration of its insured's financial and safety interests in deciding whether to repair or replace the vehicle, and (d) to writing a policy that eliminates the need to cover diminution in value.

We conclude the majority of these arguments are premised on the factual presumption Carson's vehicle was nonrepairable. As described in detail above, Carson was unable to prove this fact at trial. For this reason and because we conclude she has misconstrued the applicable law, all Carson's contentions lack merit.

(i)  *The policy was not ambiguous or against public policy.*

Carson first alleges the declarations page of the policy was ambiguous because it states coverage for property damage liability is $50,000 and uninsured motorist property damage liability is "$ Maximum." She argues a reasonable person would understand that "in the event there was insufficient insurance by another driver responsible for the accident, the policy would cover the insured's vehicle up to the maximum of $50,000." She interpreted the declarations page to mean Mercury must pay for the diminution in value to her vehicle because the at-fault driver was underinsured. We disagree.

First, the liability limits for uninsured motorists do not apply when the at-fault driver was insured. Uninsured is different from underinsured. Thus, interpretation of the uninsured motorist provision is unnecessary in this case. Second, the policy clearly and unequivocally lists as one of the exclusions the diminution of value of a repaired vehicle. Simply stated, Carson did not purchase a policy, or pay premiums, obligating Mercury to pay for stigma damages following an automobile accident.

Carson also alleges the policy is ambiguous because it does not define the terms "total loss" or "repair." She is wrong. As aptly noted by Mercury, the policy does not use the term "total loss." Rather, the collision coverage portion of the policy simply provides Mercury "will repair, replace or pay for the owned automobile or part thereof, for *loss* caused by [the] collision." (Italics added.) Mercury limits its coverage for "loss" to the cost of repairing the vehicle to its preaccident condition, unless the repairs would exceed "the agreed or appraised value" of the vehicle. In other words, having to pay the appraised value of the vehicle would signal Mercury determined the car was unrepairable or too expensive to repair. This condition is often referred to by both parties as a total loss. We conclude the policy plainly and clearly defines how this condition is determined and we find no ambiguity.

Carson also contends the policy is ambiguous because the policy does not define the term "repair." Related to this argument, Carson also asserts the provision granting Mercury the absolute right to chose repairing or paying the vehicle's market value is against public policy. We find a brief review of the general legal principles regarding interpretation of insurance contracts is helpful to addressing Carson's contentions.

It is a well-established principle that an insurer has the right to limit policy coverage in plain and understandable language and that it may limit the nature of the risk it undertakes to assume. (*Fireman's Fund Ins. Co. v. Fibreboard Corp.* (1986) 182 Cal.App.3d 462, 466 [227 Cal.Rptr. 203]; *VTN Consolidated, Inc. v. Northbrook Ins. Co.* (1979) 92 Cal.App.3d 888, 892 [155

Cal.Rptr. 172].) Nevertheless, an insurance company's limitation of coverage must conform to the law and public policy. (*Lumberman's Mut. Cas. Co. v. Wyman* (1976) 64 Cal.App.3d 252, 259 [134 Cal.Rptr. 318].) Furthermore, it is also well settled that insurance contracts, as contracts of adhesion, are subject to careful judicial scrutiny to avoid injury to the public. (See *Steven v. Fidelity & Casualty Co.* (1962) 58 Cal.2d 862, 882 [27 Cal.Rptr. 172, 377 P.2d 284].) Courts considering adhesion contracts have a heightened responsibility to prevent the marketing of policies that provide unrealistic and inadequate coverage. Thus, any portion of an insurance contract which is violative of public policy is not enforceable. (*Ritter v. Mutual Life Insurance Co.* (1898) 169 U.S. 139, 158 [42 L.Ed. 693, 18 S.Ct. 300] [public policy supports conclusion life insurance becomes void if insured commits suicide when sane]; *Sparks v. St. Paul Ins. Co.* (1985) 100 N.J. 325 [495 A.2d 406] (*Sparks*) [medical malpractice liability policy that only covered claims made during policy term deemed unenforceable as violating public policy].)[2]

■ However, the above principles must be applied cautiously in view of the disfavor in the law of a court's interference with the parties' freedom of contract. (See Cal. Const., art. I, § 1.) To this end, we recognize "A standard form of insurance policy is governed by the ordinary rules of interpretation of contracts. [Citation.] 'Although ambiguities or uncertainties in an insurance policy must be resolved against the insurer, nevertheless, the policy must be given a reasonable interpretation and the words used are to be given their common, ordinary and customary meaning.' [Citations.] Where there is no doubt in the meaning of the policy language, courts will not strain to find ambiguities. [Citations.] Neither will the courts construe exclusions strictly against the insurer absent some ambiguity. [Citation.] Exclusionary clauses which meet the plain, clear and conspicuous requirement will be given effect. [Citation.]" (*Mid-Century Ins. Co. v. Bash* (1989) 211 Cal.App.3d 431, 436 [259 Cal.Rptr. 382].) "Where no dispute surrounds material facts, interpretation of an insurance policy presents solely a question of law." (*Hauser v. State Farm Mut. Auto. Ins. Co.* (1988) 205 Cal.App.3d 843, 846 [252 Cal.Rptr. 569].)

As for Carson's argument that we must assume the term "repair" is ambiguous simply because no definition was provided in the policy, we direct her attention to our Supreme Court's opinion *Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 866 [21 Cal.Rptr.2d 691, 855 P.2d 1263] [we reject the view "the lack of a policy definition

---

[2] " '[P]ublic policy' is that principle of law which holds that 'no person can lawfully do that which has a tendency to be injurious to the public or against public good . . .' even though 'no actual injury' may have resulted therefrom in a particular case 'to the public.' It is a question of law which the court must decide in light of the particular circumstances of each case." (*Sparks, supra*, 495 A.2d at p. 412.)

necessarily creates ambiguity"].) Carson also asserts the term "repair" in the policy led her to believe the vehicle would be restored to its preaccident condition *and value*. To support her interpretation, Carson cites to the nationwide debate over whether an insurer's duty to "repair" the physical parts of the vehicle also encompasses a duty to pay cash for any diminished value caused by the repairs. However, as noted earlier in this opinion, that debate took place nearly a decade ago. And the policies being analyzed by the courts in those opinions did not contain the express exclusions found in Mercury's current policy, which clearly and plainly explain the policy will not apply "to loss due to diminution in value of any motor vehicle *repaired* under coverages D [(comprehensive)] or E [(collision)]." (Italics added.) Mercury's policy now clearly defines its "repair" obligation as not including "diminution in value."

Another one of Carson's arguments is that to give Mercury the unfettered option of repairing rather than paying the preaccident market value of the car renders the policy unenforceable as being against public policy. Alternatively, she argues Mercury's discretion in choosing either option must be tempered by the covenant of good faith and fair dealing. We find these contentions also lack merit.

Carson's public policy argument appears to be dependent on the theory Mercury attempted to repair a vehicle that could not be restored to its preaccident safe condition and it also failed to take into account the car had a significant depreciation in value due to the repairs. Certainly public policy concerns (as well as the covenant of good faith and fair dealing) would come into play if Mercury had refused to acknowledge the vehicle was nonrepairable but nevertheless proceeded with a purely cosmetic restoration. However, as stated earlier in this opinion, Carson was unable to prove the vehicle *could* not be restored. The witnesses, including Carson's witnesses, testified the vehicle could be restored to its preaccident safe condition *applying the manufacturer's repair standards*. Mercury's election to repair the vehicle under these circumstances was not injurious to the public or carried out in bad faith.

Likewise, Mercury's failure to take into account the vehicle's depreciation in value when opting to repair the vehicle cannot be deemed against public policy or the covenant of good faith. As stated, the insurer has the right to limit the nature of the risk it undertakes to assume. It limited the policy's coverage in plain and understandable language to exclude payments for diminution in value. We cannot say this exclusion is against the public good because Carson did not pay Mercury premiums for this added form of coverage. Although we believe the time may have come for insurance companies to evolve with the technological advances of cars and offer

consumers coverage for diminution in value, we cannot say Mercury acted in bad faith by repairing, as promised in the policy, Carson's vehicle to its preaccident safe, mechanical, and cosmetic condition.[3]

### (ii) *Mercury did not violate the "made-whole rule."*

Carson alleged Mercury violated the covenant of good faith and fair dealing by pursuing a claim for subrogation against her interests. "The made-whole rule is a common law principle that limits the insurer's reimbursement right in situations where the insured has not recovered his or her 'entire debt.' (See *Sapiano v. Williamsburg Nat. Ins. Co.* (1994) 28 Cal.App.4th 533, 536 [33 Cal.Rptr.2d 659] (*Sapiano*); [citation].) The rule precludes an insurer from recovering any third party funds paid to the insured until the insured has ' "been fully compensated for [his or] her injuries . . . ." ' [Citation.] [¶] California courts recognize a made-whole rule when—typically due to underinsurance—the tortfeasor could not pay his or her 'entire debt' to the insured: ' "The general rule is that an insurer that pays a portion of the debt owed to the insured is not entitled to [reimbursement] for that portion of the debt until the debt is fully discharged." ' [Citation.]" (*21st Century Ins. Co. v. Superior Court* (2009) 47 Cal.4th 511, 519 [98 Cal.Rptr.3d 516, 213 P.3d 972].)

In this case, the at-fault driver, Anderson, had an insurance policy with a property damage limit of $10,000, a bodily injury limit of $15,000 per person, and $30,000 per accident. Carson, represented by counsel, made a personal injury claim against Anderson's insurer. She settled her personal injury claim for the policy limit of $15,000. Carson did not make a property damage claim against the insurer for the diminution of value to her repaired vehicle that was not covered under her own policy. She signed a property damage release form. In short, she recovered her entire debt she claimed from Anderson's insurance.

Mercury made a subrogation claim against Anderson's insurance for the benefits it paid to Carson under her collision coverage (over $18,000). Mercury received the policy limits of $10,000 and from this sum paid Carson $500 to reimburse her for towing expenses.

We agree with the trial court's determination Mercury did not violate the made-whole rule by seeking subrogation for property damages based on the fact Carson never made a property damage claim (and never requested a payment for the diminution in value of her vehicle) before she signed a

---

[3] The parties did not discuss whether a California consumer can currently purchase insurance for "stigma damages." Whether this form of coverage serves the best interests of the public is best addressed by the Legislature or the Insurance Commissioner.

property damage release in favor of Anderson. Based on these facts, Carson would not be able to recover any further damages from Anderson's insurance, including a diminution in value claim. Anderson's insurance has paid all the claims she requested from him. Therefore, the debt was fully discharged. Mercury was free to pursue a property damage subrogation claim.

### (iii) *The claims related to the covenant of good faith and fair dealing lack merit.*

" 'Every contract imposes on each party a duty of good faith and fair dealing in each performance and in its enforcement.' [Citations.] Simply stated, the burden imposed is ' "that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." ' [Citation.] Or, to put it another way, the 'implied covenant imposes upon each party the obligation to do everything that the contract presupposes they will do to accomplish its purpose.' [Citation.] This rule was developed 'in the contract arena and is aimed at making effective the agreement's promises.' [Citation.] The 'precise nature and extent of the duty imposed . . . will depend on the contractual purposes.' [Citation.]" (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1393 [272 Cal.Rptr. 387] (*Careau*).)

It is well established a breach of the implied covenant of good faith is a breach of the contract (*Careau, supra*, 222 Cal.App.3d at p. 1393), and that breach of a specific provision of the contract is not a necessary prerequisite to a claim for breach of the implied covenant of good faith and fair dealing. (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 373 [6 Cal.Rptr.2d 467, 826 P.2d 710] (*Carma*); see *Comunale v. Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 659 [328 P.2d 198] [implied obligation of good faith and fair dealing "requires the insurer to settle in an appropriate case although the express terms of the policy do not impose such a duty"].) "Nor is it necessary that the party's conduct be dishonest." (*Carma, supra*, 2 Cal.4th at p. 373.) Moreover, even an insurer that pays the full limits of its policy may be liable for breach of the implied covenant, if improper claims handling causes detriment to the insured. (*Fleming v. Safeco Ins. Co.* (1984) 160 Cal.App.3d 31, 37–38 [206 Cal.Rptr. 313].)

Carson alleges Mercury violated the covenant of good faith and fair dealing by failing to properly investigate her claim. This argument is rendered moot by the evidence Mercury paid over $18,000 to Carson to repair her car to its preaccident condition. Carson was unable to prove the car was nonrepairable. There are no other facts in the record that would support the claim Mercury failed to investigate Carson's claim in breach of the covenant of good faith.

Carson also alleges the covenant of good faith and fair dealing was breached when Mercury failed to take into account her safety and financial interests when it opted to repair the vehicle. As we have stated, there is no evidence to support the theory Mercury failed to take into account Carson's safety when it paid to repair the vehicle. The witnesses agreed the car *could have been* repaired to its preaccident safe condition applying the manufacturer's repair standards. That Carson's financial interests were negatively affected after the repair was not a breach of the covenant because stigma damages were not a contracted benefit of the bargain. Mercury did all that it promised to do.

■ Carson asserts Mercury had a covenant of good faith to ensure its insurance policy contained "the requirements of fairness and equitable claims settlement practices mandated" by Insurance Code section 790.03. That section describes the many acts "defined as unfair methods of competition and unfair and deceptive acts or practices in the business of insurance." (Ins. Code, § 790.03.) Any person who engages in these unfair acts or practices (there are over 25 listed) may have to pay a civil penalty fixed by the Insurance Commissioner. (Ins. Code, § 790.03.) Insurance Code section 790.03, subdivision (h), lists 16 illegal business practices involving unfair claims settlement practices. Carson does not explain how Mercury's decision to repair her car violated any of the 16 listed illegal acts, nor does she provide case authority linking violation of these particular acts to the covenant of good faith and fair dealing. Our scope of review is limited to issues that have been adequately raised and are supported by analysis. (*Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6 [76 Cal.Rptr.2d 457].) When an appellant raises an issue "but fails to support it with reasoned argument and citations to authority, we treat the point as waived. [Citations.]" (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785 [79 Cal.Rptr.2d 273].)

Finally, we address Carson's argument it was a breach of the covenant of good faith and fair dealing to write a policy which eliminates the need to cover diminution in value. This argument is nonsensical. The nature and extent of the duty imposed under a covenant of good faith is dependent on the contractual purpose and agreed-upon benefits of the bargain. As stated above, " 'Every contract imposes on each party a duty of good faith and fair dealing in each performance and in its enforcement.' [Citations.]" (*Careau, supra,* 222 Cal.App.3d at p. 1393.) We found no authority, and Carson cites to none, holding the covenant of good faith is triggered before the agreement is formed and also imposes a duty to *draft* an agreement in a particular way. The argument is meritless.

## III

The judgment is affirmed. Respondent shall recover its costs on appeal.

Rylaarsdam, J., and Thompson, J., concurred.