Filed 12/28/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ROBERT WESTMORELAND et al., Plaintiffs and Respondents, v. FIRE INSURANCE EXCHANGE, Defendant and Appellant. | A160387 (Lake County Super. Ct. No. CV418827) |

This case requires an analysis of the indemnity owed under an extended replacement cost insurance policy after the plaintiff insureds suffered a total loss of their insured dwelling. The defendant insurer had paid the plaintiffs an amount equivalent to the actual cash value of the lost dwelling, and they built a replacement dwelling at a different location for no more than that amount. After the defendant refused to make additional indemnification payments, the plaintiffs filed the instant action to recover the difference between the amount they already received and the estimated amount of what it would have cost to rebuild their dwelling at the insured location.

Section 2051.5 of the Insurance Code[1] addresses the measure of indemnity for a policy of insurance "that requires payment of the replacement cost for a loss." (§ 2051.5, subd. (a)(1).) During the policy period at issue (2015–2016), the applicable version of this statute was section 2051.5, as

---

[1] All statutory references are to this code unless otherwise indicated.

amended by Statutes 2005, chapter 448, section 2 (Sen. Bill. No. 518) (hereafter former section 2051.5). The principal question is whether former section 2051.5 requires the defendant to indemnify the plaintiffs for the amount of claimed replacement costs over and above the actual cash value amount they received, even though they did not actually incur such costs. Applying settled principles of statutory construction, we conclude the answer is no. Because the defendant is neither statutorily nor contractually required to pay for the claimed costs, we conclude the trial court erred in overruling the defendant's demurrer to the complaint.

## FACTUAL AND PROCEDURAL BACKGROUND

The following background facts are taken from the complaint and stipulations of the parties.

In 2015, plaintiffs Robert and Dolores Westmoreland owned a dwelling in Cobb, California (the insured premises) that was covered under a "Landlords Protector" package issued by defendant Fire Insurance Exchange, also known as Farmers Insurance (Insurer).

Insurer's policy provided coverage for fire loss, with a coverage limit of $372,000 under "Coverage A—Dwelling" (Coverage A). This "open policy"[2] provided up to 125 percent of the Coverage A limit for "Extended Replacement Cost" coverage, i.e., $465,000 (1.25 x $372,000). Thus, the policy contemplated a total of $465,000—or $93,000 over the Coverage A limit—that would be available to plaintiffs as indemnity for repairing, rebuilding, or replacing their dwelling after a fire, provided all valid conditions of the policy were met.

---

[2] An open policy of insurance is "one in which the value of the subject matter is not agreed upon, but is left to be ascertained in case of loss." (§ 411.)

2

The policy included a term requiring the insureds to rebuild or replace the lost dwelling in order to collect the full replacement cost: "When the cost to repair or replace is more than $1000 . . . , [Insurer] shall pay no more than the **actual cash value** of the damage until repair or replacement is completed. . . ." Another policy term stipulated that "covered loss to buildings under Coverage A . . . will be settled at replacement cost without deduction for depreciation subject to the following: [¶] (1) Settlement under replacement cost will not be more than the smallest of the following: [¶] (a) the limit of insurance under this policy applying to the building; [¶] (b) the replacement cost of that part of the building damaged for equivalent construction and use on the same premises; [¶] (c) The amount actually and necessarily spent to repair or replace the building intended for the same occupancy and use." This opinion will refer to this latter policy term as the "Loss Settlement provision."

In 2015, plaintiffs suffered a total loss of their rental home in Cobb when a wildfire (the Valley Fire) swept through Lake County. The estimated cost to rebuild or replace that dwelling at the Cobb location was approximately $422,676.

Insurer paid plaintiffs $372,000, a sum equivalent to the actual cash value of the lost dwelling.[3] Plaintiffs opted to build a replacement home at a different location, and they were able to do so for no more than $372,000. Plaintiffs then demanded that Insurer pay the additional sum of $50,676, which represented the difference between the actual cash value amount

---

[3]    At oral argument, plaintiffs' counsel suggested the record on appeal contains no evidence of the actual cash value of the lost dwelling. But the insurance policy, the trial court's order on the demurrer, and parties' appellate briefing all indicate Insured's payment of $372,000 represented a payment of the actual cash value of the lost dwelling.

($372,000) and the estimated cost to rebuild the dwelling at the Cobb location ($422,676). Insurer refused, relying on the policy's Loss Settlement provision.

Plaintiffs filed a complaint against Insurer, alleging causes of action for breach of insurance contract and breach of the implied covenant of good faith and fair dealing. The complaint seeks economic damages of not less than $50,676 and punitive damages. The complaint also alleges a cause of action for declaratory relief and seeks a determination of the parties' legal duties and obligations under subdivision (c) of former section 2051.5 (hereafter former section 2051.5(c) or former subdivision (c)), which at all relevant times provided that, where a "total loss" of an insured structure occurs, the insurer cannot limit or deny payment of the replacement costs if the insured "decides to rebuild or replace the property at a location other than the insured premises," and in such cases, "the measure of indemnity shall be based upon the replacement cost of the insured property and shall not be based upon the cost to repair, rebuild, or replace" at the other selected location.

Insurer demurred to the complaint, contending that neither former section 2051.5 nor the insurance policy requires payment for replacement costs plaintiffs never actually incurred. The trial court overruled the demurrer, contending it could "not find, as a matter of law," that plaintiffs were "only entitled under the terms of the policy and the application of section 2051.5, on the circumstances presented here, to the actual amount of money spent in rebuilding the residence at the new location."

After the court issued its ruling, the parties entered a "Settlement Agreement and Agreement to Entry of a Stipulated Judgment" in the amount of $90,000 for plaintiffs "without prejudice to the parties' right to be heard on appeal," as well as a covenant not to execute on the judgment. The notice of

4

entry of the stipulated judgment was filed on May 29, 2020, and Insurer timely appealed.

## DISCUSSION

As indicated, the Loss Settlement provision of the subject replacement cost insurance policy limits Insurer's indemnification obligation to payment of the amount that plaintiffs "actually and necessarily spent to repair or replace" their lost dwelling. We must decide whether that policy provision aligns with former section 2051.5, or whether the statute requires Insurer to indemnify plaintiffs the full amount of the estimated replacement cost of rebuilding the dwelling at the insured premises. This is a matter of statutory construction.

The Insurance Code governs all insurance policies issued in California. (*California Fair Plan Assn. v. Garnes* (2017) 11 Cal.App.5th 1276, 1305 (*Garnes*).) As *Garnes* recognized, " 'the business of insurance is a matter of the public interest, and insurance contracts are subject to the reasonable exercise of the state's police power.' [Citation.]" (*Ibid*.) Thus, an insurer's "limitation of coverage must conform to the law and public policy" (*Carson v. Mercury Ins. Co.* (2012) 210 Cal.App.4th 409, 426), and any policy term that fails to conform to the Insurance Code is unenforceable. (*Garnes*, at p. 1305; see § 2071 [standard form of fire insurance policy for California]; e.g., *Century-National Ins. Co. v. Garcia* (2011) 51 Cal.4th 564 [intentional loss policy exclusions were invalid insofar as they impermissibly reduced statutorily mandated coverage].)

As with any other statute, our fundamental task in construing an insurance statute "is to determine the Legislature's intent to effectuate the law's purpose, giving the statutory language its plain and commonsense meaning. We examine that language, not in isolation, but in the context of

5

the statutory framework as a whole to discern its scope and purpose and to harmonize the various parts of the enactment. [Citation.] 'If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.' [Citation.]" (*Busker v. Wabtec Corp.* (2021) 11 Cal.5th 1147, 1157 (*Busker*); see *Garnes, supra,* 11 Cal.App.5th at p. 1287.) Our review of this issue is de novo. (*In re E.F.* (2021) 11 Cal.5th 320, 326.)

There is no dispute plaintiffs have an open policy of insurance that provides for extended replacement cost coverage and requires they rebuild or replace their lost dwelling in order to collect the full replacement cost. According to the policy, the Coverage A limit was $372,000 and the limit of the extended replacement cost coverage was $93,000.

Here, plaintiffs' decision not to rebuild their dwelling at the insured premises—and instead, building a replacement dwelling elsewhere— triggered application of former section 2051.5, a statute that specifically addressed the measure of indemnity for open policies providing replacement cost coverage. While agreeing that the statute governs their respective rights and obligations, the parties dispute how two of its provisions—subdivision (a) and subdivision (c)—were intended to operate in these circumstances and whether the statute required reimbursement of replacement costs that were not actually incurred. We start by examining the statutory language.

Subdivision (a) of former section 2051.5 (hereafter former section 2051.5(a) or former subdivision (a)) consists of the following two unnumbered paragraphs: "[¶] Under an open policy that requires payment of the

6

replacement cost for a loss, *the measure of indemnity is the amount that it would cost the insured to repair, rebuild, or replace the thing lost or injured, without a deduction for physical depreciation, or the policy limit, whichever is less.*" [¶] If the policy requires the insured to repair, rebuild, or replace the damaged property in order to collect the full replacement cost, the insurer shall pay the actual cash value of the damaged property, as defined in Section 2051,[4] until the damaged property is repaired, rebuilt, or replaced. Once the property is repaired, rebuilt, or replaced, *the insurer shall pay the difference between the actual cash value payment made and the full replacement cost reasonably paid to replace the damaged property, up to the limits stated in the policy.*" (Italics added.)[5] Thus, the first paragraph of former subdivision (a) specifies what "the measure of indemnity is" for a replacement cost insurance policy, while the second paragraph applies when such a policy requires the insured to rebuild or replace the lost property and sets forth an indemnification procedure that requires payment of the actual cash value of the loss and thereafter limits the insurer's indemnity obligation to "the full replacement cost reasonably paid," up to the applicable policy limits.  (Former § 2051.5(a).)

In turn, former section 2051.5(c) provides in full:  *"In the event of a total loss of the insured structure,* no policy issued or delivered in this state may

---

[4]    Since 2004, the relevant portion of section 2051 has provided: "(b) Under an open policy that requires payment of actual cash value, the measure of the actual cash value recovery, in whole or partial settlement of the claim, shall be determined as follows:  [¶] (1) In case of total loss to the structure, the policy limit or the fair market value of the structure, whichever is less."  (Stats. 2004, ch. 605, § 2 (Assem. Bill No. 2962).)

[5]    The two paragraphs of former subdivision (a) appear in the current version of section 2051.5 as subdivisions (a)(1) and (a)(2).  (Stats. 2020, ch. 261, § 1 (Sen. Bill No. 872).)

contain a provision that limits or denies payment of the replacement cost in the event the insured decides to rebuild or replace the property at a location other than the insured premises.  However, *the measure of indemnity shall be based upon the replacement cost of the insured property and shall not be based upon the cost to repair, rebuild, or replace at a location other than the insured premises*."  (Italics added.)[6]

Insurer argues that subdivisions (a) and (c) of former section 2051.5 must be read together and that considered as a whole, the statute does not conflict with the subject policy's Settlement Loss provision that limits Insurer's payment of replacement cost to the "smallest" of three specified amounts, including the "amount actually and necessarily spent to repair or replace" the lost dwelling.  Conversely, plaintiffs contend that former section 2051.5(c)—which itself contains no language limiting indemnity to replacement costs actually or reasonably incurred—is the only relevant statutory provision where, as here, insureds suffer a total loss and decide to build at a location other than the insured premises.  Applying settled principles of statutory construction, we conclude that former subdivision (c) cannot be read in isolation and that the statute must be read as a whole. (*Busker, supra,* 11 Cal.5th at p. 1157.)

Examining former section 2051.5 as a whole, we see that the first paragraph of former subdivision (a) articulates a general rule that when an insured claims a loss under a replacement cost policy such as the one here, the measure of indemnity is the lesser of the following two amounts:  (1) the amount it would cost the insured to rebuild or replace the property lost without a deduction for physical depreciation; and (2) the amount of the

---

[6]  Subdivision (c) of section 2051.5 has been amended twice since the version that was operative in this case.  (Stats. 2018, ch. 628, §§ 1, 1.3, 1.5, 1.7 (Assem. Bill No. 1800); Stats. 2020, ch. 261, § 1 (Sen. Bill No. 872).)

stated policy coverage limits.  Meanwhile, former subdivision (c) specifies that in cases of total loss of an insured structure, insurers are prohibited from limiting or denying payment of replacement costs if the insured rebuilds at a location other than the insured premises.  Former subdivision (c) also clarifies that for purposes of the general rule stated in former subdivision (a), "the measure of indemnity *shall be based upon* the replacement cost of the insured property and *shall not be based upon* the cost to repair, rebuild, or replace at a location other than the insured premises."  (Italics added.)

Reading former subdivisions (a) and (c) together, former section 2051.5 makes reasonably clear that the measure of indemnity for any given replacement cost policy is the same no matter where the insured decided to rebuild or replace in cases of total loss.  That is, for the insured who decided to build or replace elsewhere, the measure of indemnity is the lesser of the following:  (1) the amount it would cost to rebuild or replace the structure *at the insured premises*; and (2) the amount of the coverage limit stated in the policy.  Thus, whether the cost to replace a dwelling at a different location turns out to be significantly higher or significantly lower than the estimated replacement cost at the insured premises, former section 2051.5 provides certainty to both the insurer and the insured that the full scope of a policy's extended replacement cost coverage would be available to the insured no matter where the lost dwelling is replaced.

Contrary to plaintiffs' suggestion, former section 2051.5(c) cannot logically be read as standing on its own or requiring a different alternative amount of replacement cost indemnity in total loss cases where the insured decided to build at a new location.  Pursuant to the first paragraph of former section 2051.5(a), indemnity for the amount it would cost to rebuild a lost dwelling is available to the insured only if it is less than the amount of the

9

applicable policy limit. But former subdivision (c) makes no reference whatsoever to the policy limit as a measure of indemnity. Consequently, if former subdivision (c) were construed as setting forth an alternative and independent measure of indemnity, then by its terms the sole measure of indemnity for replacing a dwelling at a different location is the amount it would cost to rebuild at the insured premises, without regard to the coverage limits listed in the policy if the cost to replace were to exceed such limits. Such a construction would be absurd, as it would effectively convert all basic replacement cost policies into guaranteed replacement cost policies.[7]

We now consider the language of former subdivision (a)'s second paragraph. To reiterate, that paragraph provides: "If the policy requires the insured to repair, rebuild, or replace the damaged property in order to collect the full replacement cost, the insurer shall pay the actual cash value of the damaged property, as defined in Section 2051, until the damaged property is repaired, rebuilt, or replaced. Once the property is repaired, rebuilt, or replaced, *the insurer shall pay the difference between the actual cash value payment made and the full replacement cost reasonably paid to replace the damaged property, up to the limits stated in the policy*." (Italics added.)

Does former subdivision (a)'s second paragraph apply when a total loss has occurred and the insured builds a replacement dwelling at a different location? We conclude the answer is yes. As discussed, reading former

---

[7] A policy offering replacement cost coverage "only pays for replacement costs up to the limits specified in [the] policy," while a policy offering extended replacement cost coverage provides "additional coverage above the dwelling limits up to a stated percentage or specific dollar amount." (Ins. Code, § 10102, subd. (a) [specifying language of required policy disclosures].) A policy offering *guaranteed* replacement cost coverage, however, provides more generous benefits and covers "the full cost to repair or replace the damaged or destroyed dwelling *regardless of the dwelling limits shown on the policy declarations page*." (*Ibid*., italics added.)

subdivision (c) without reference to former subdivision (a) would impermissibly convert basic replacement cost policies into guaranteed replacement cost policies. Moreover, there is no language in former subdivision (a) that restricts application of its second paragraph to situations where an insured rebuilds a lost dwelling at the insured location. Nor does former subdivision (c) contain any language purporting to exempt its subject matter from all or part of former subdivision (a)'s operation.[8] Finally, we have consulted the relevant legislative history and found nothing indicating a legislative desire to ensure that insureds who replace a lost dwelling at a different location recover replacement costs that have not been incurred.

Properly construed, former section 2051.5 applies to the facts here as follows. The first paragraph of former subdivision (a) sets the maximum amount of indemnity available to plaintiffs at $422,676 (the estimated cost of repair at the insured premises, as required by former subdivision (c)), because that amount is less than $465,000 (the sum of the $372,000 Coverage A limit and $93,000 extended replacement cost coverage limit). As required by the second paragraph of former subdivision (a), Insurer paid plaintiffs $372,000 (the actual cash value of the lost premises). Although a maximum of $422,676 was available to plaintiffs no matter where they decided to replace their lost dwelling, plaintiffs in fact incurred no more than $372,000 in replacement costs. Because the second paragraph of former subdivision (a) limits Insurer's indemnification obligation to payment of "the full

---

[8]    The trial court appears to have discerned significance in the difference between former subdivision (a)'s references to "damaged property" and former subdivision (c)'s reference to "in the event of a total loss of the insured structure." We conclude this language difference casts no doubt on our construction of former 2051.5. We have been directed to no authority suggesting that, in this context, the term "damaged property" excludes property that has been destroyed or otherwise declared a total loss.

replacement cost reasonably paid to replace" the lost dwelling, plaintiffs have already received all the indemnity to which they are entitled, i.e., $372,000.

Construing former section 2051.5 in this manner does not lead to absurd results in its operation. So construed, former subdivisions (a) and (c) together operate to place all insureds with replacement cost coverage policies on the same footing, whether they replace their lost dwellings at the insured location or elsewhere. No matter where a lost dwelling is replaced, the amount of indemnification available under a replacement cost policy is either the amount it costs to replace the dwelling at the insured premises without a deduction for physical depreciation or the amount of the policy's coverage limits, whichever is less. Likewise, no matter where a lost dwelling is replaced, policies that require the insured to rebuild or replace in order to collect the full replacement cost are governed by the same indemnification procedure and limitation on replacement cost recovery. That is, the insured is entitled to an advance payment of the actual cash value of the lost dwelling and thereafter to the balance of reasonably incurred replacement costs, up to the policy limits.

Plaintiffs suggest this construction of former section 2051.5(c) renders its terms "completely meaningless." Such hyperbole is without force.

Prior to former 2051.5's enactment, some insurance companies refused to compensate insureds who replaced their lost dwellings at locations other than at the original insured premises. (See Assem. Com. on Insurance, Rep. on Assem. Bill No. 2199 (2003–2004 Reg. Sess.) as amended Apr. 29, 2004, p. 2.) Not only did the adoption of former subdivision (c) serve to prohibit such refusals, but it ensured that if a policy provided coverage for extended replacement cost or guaranteed replacement cost, the full scope of such coverage would be available to the insured whether the lost dwelling was

12

replaced at the insured location or elsewhere.  Contrary to plaintiffs' suggestion, the terms of former subdivision (c) provide significant protections for homeowners with replacement cost insurance policies.

Our construction of former section 2051.5 aligns with an April 3, 2008 legal opinion written by General Counsel for the California Department of Insurance in response to a San Diego City council member's inquiry regarding application of former section 2051.5(c).  In that opinion, General Counsel wrote that the council member had requested a legal opinion on the following question:  "If a homeowner purchases a home at a new location for less than the cost to rebuild at the original location, is the homeowner entitled to recover the full amount it would cost to rebuild at the original location?"  General Counsel first observed that former subdivisions (a) and (c) "must be read together," and that so read, the statute's plain language furnished the answer to the question.

In responding "No" to the council member's inquiry, General Counsel posed a hypothetical in which (1) a homeowner has a basic replacement cost policy with a $500,000 Coverage A limit; (2) the home is destroyed by fire and the cost to replace the home at the original location is $500,000; and (3) the homeowner builds a replacement home at a new location for $400,000.  In concluding the homeowner could not recover both the $400,000 it cost to build the new home plus another $100,000 representing the additional amount the homeowner would have received if the home were rebuilt at the original location, General Counsel reasoned:  "Allowing the homeowner building at a new location to recover cash unrelated to the actual cost of building effectively would read the phrase 'replacement cost *reasonably paid to replace the damaged property*' out of Section 2051.5(a).  Such a reading is impermissible.  Whether replacing at an original or a new location, the

homeowner may not recover amounts above actual cash value not actually and reasonably spent to rebuild." While General Counsel's legal opinion has no value as precedent or as an agency guideline, standard, or rule (see § 12921.9)[9], we take it as an indication that our construction of section 2051.5 raises no red flags for the agency responsible for regulating insurance.

Moreover, our conclusion is largely consistent with two federal decisions that have addressed the issue: *Tyler v. Travelers Commercial Ins. Co.* (N.D.Cal. 2020) 499 F.Supp.3d 693 and *Galusha v. Unigard Insurance Company* (N.D.Cal., Jun. 28, 2019, No. C 18-06905 SBA) 2019 U.S.Dist. Lexis 228527, affd. (9th Cir. 2020) 816 Fed.Appx. 46 (Mem). Although these federal decisions are not binding on us, we independently agree with their determination that former section 2051.5 and its subdivisions must be read as a whole.

In closing, we do not suggest that plaintiffs' alternative construction of the statute necessarily implicates an illogical or unreasonable public policy. However, we are bound to respect the intent and policy choices of the Legislature, and established principles of statutory construction require that we construe the terms of former section 2051.5 as they were written. (*Busker, supra,* 11 Cal.5th at p. 1157.) Here, plaintiffs have already received the full measure of indemnity to which they are entitled because they were paid the actual cash value of the insured dwelling ($372,000) and built a replacement dwelling at a different location without incurring additional replacement costs over and above that amount. Because Insurer has paid all

---

[9]     Section 12921.9 provides in relevant part: "(b) A letter or legal opinion made public pursuant to this section shall not be construed as establishing an agency guideline, criterion, bulletin, manual, instruction, order, standard of general application, rule, or regulation, as those terms are described in Sections 11340.5 and 11342.600 of the Government Code."

benefits due under former section 2051.5 and the policy, the trial court should have sustained defendants' demurrer to each of plaintiffs' causes of action without leave to amend.[10]

## DISPOSITION

The judgment of the trial court is reversed. The matter is remanded with directions to vacate the order overruling Insurer's demurrer and for further proceedings consistent with this opinion. The parties shall bear their own costs on appeal.

---

[10] Plaintiffs contend the judgment must be affirmed if the demurrer ruling is correct for any reason, but they fail to offer any cogent basis for doing so.

15

_____
Fujisaki, J.

WE CONCUR:


_____
Tucher, P. J.


_____
Rodríguez, J.

A160387/*Westmoreland et al. v. Fire Insurance Exchange*

## Robert Westmoreland et al. v. Fire Insurance Exchange (A160387)

Trial Court:        Lake County

Trial Judge:        Hon. Michael S. Lunas

Attorneys:

        Demler, Armstrong & Rowland, John R. Brydon, David A. Ring; Hansen, Kohls, Sommer & Jacob and Bret N. Batchman for Defendant and Appellant.

        The O'Connor Law Firm and Timothy J. O'Connor for Plaintiffs and Respondents.